STATE OF NORTH CAROLINA v. GLOYD A. VESTAL

No. 3

(Filed 12 May 1971)

**1. Criminal Law § 105— motion for nonsuit — question presented**

Upon the defendant's motion for judgment of nonsuit in a criminal action, the question for the court is whether there is substantial evidence of each essential element of the offense charged, or of a lesser offense included therein, and of the defendant's being the perpetrator of such offense; if so, the motion is properly denied.

**2. Criminal Law § 104— nonsuit motion — consideration of incompetent evidence**

In determining the nonsuit motion, incompetent evidence which has been admitted must be considered as if it were competent.

**3. Criminal Law § 106— motion for nonsuit — sufficiency of evidence**

The test of the sufficiency of the evidence to withstand the motion for judgment of nonsuit is the same whether the evidence is circumstantial, direct, or both.

**4. Homicide § 21— murder prosecution — sufficiency of evidence**

Issue of defendant's guilt of murder with premeditation and deliberation was properly submitted to the jury, where there was evidence that (1) on 21 June 1969 the dead body of the victim, wrapped in a gold-colored drapery and heavy chains, was found floating in Lake Gaston; (2) the victim's skull had been fractured in five separate places by blows from a heavy instrument; (3) around 7 p.m. on 15 June 1969 the victim had left his home to go on a business trip with the defendant; (4) just prior to 8 p.m. the victim was last seen alive walking up to the defendant's flower shop; (5) the police discovered in defendant's warehouse some gold-colored draperies that were similar to the drapery around the victim's body; (6) the walls and ceiling of the warehouse had numerous spatters of human blood, some of which contained hairs that matched, microscopically, hairs taken from the victim's body; (7) the trunk of defendant's automobile contained splotches of blood, as well as hair that matched hairs taken from the victim's body; (8) the defendant and the victim had

associated in numerous business dealings involving substantial sums of money; (9) at the time of his death the victim held past due notes of the defendant in amounts of $70,000 and $40,000, and a large indebtedness involving the defendant was to fall due on 16 June 1969; (10) the defendant's and the victim's trip of 15 June 1969 was related to their controversy over the indebtedness of 16 June 1969; (11) the victim had communicated to defendant his anger over the defendant's failure to pay the controverted indebtedness and his determination to collect it.

5. Searches and Seizures § 3— search warrant — requisites of affidavit — incompetent evidence

A valid search warrant may be issued upon the basis of an affidavit setting forth information which may not be competent as evidence.

6. Searches and Seizures § 3— search warrant — sufficiency of affidavit

The affidavit to a search warrant is sufficient if it supplies reasonable cause to believe that the proposed search for evidence of the commission of the designated crime will reveal the presence upon the described premises of the objects sought and that they will aid in the apprehension or conviction of the offender.

7. Searches and Seizures § 3— affidavit of search warrant — reports from FBI labs

Affidavit in a search warrant which was based in part upon reports from the FBI laboratories concerning the examination of materials taken from a warehouse, *held* sufficient to support a magistrate's finding of probable cause for the issuance of the warrant to search the warehouse. G.S. 15-26.

8. Searches and Seizures § 3— validity of search warrant — voir dire hearing

Upon a *voir dire* hearing to determine the validity of a search warrant, the court should receive evidence and make findings of fact.

9. Searches and Seizures § 2— warrantless search — voluntariness of consent for the search

In ruling upon the admissibility of evidence obtained by a warrantless search, the determining fact is whether the consent to the search was given voluntarily and without compulsion from the officers.

10. Searches and Seizures § 2— waiver of search warrant — consent by owner of premises

The owner of the premises may consent to a search thereof and thus waive the necessity of a valid search warrant so as to render the evidence obtained in the search competent.

11. Searches and Seizures § 2; Constitutional Law § 37— consent to warrantless search — waiver of constitutional rights — burden of proof

The consent of an owner to a warrantless search of his premises must be freely and intelligently given, without coercion, duress, or

State v. Vestal

fraud; and the burden is upon the State to prove that it was so, the presumption being against the waiver of fundamental constitutional rights.

12. **Searches and Seizures § 2— consent to warrantless search —Miranda warnings**

The warnings required by *Miranda v. Arizona* need not be given by officers before obtaining the consent of the owner to a search of his premises.

13. **Searches and Seizures § 2— warrantless search of warehouse — voluntariness of defendant's consent**

Warrantless search of defendant's warehouse which produced draperies similar to a drapery wrapped around the body of a homicide victim *held* lawful where the defendant consented to the search at a time when he was not under arrest or in custody and was not charged with any criminal offense.

14. **Criminal Law § 84— objection to evidence obtained by warrantless search — voir dire hearing**

Although defendant objected to the admission of evidence obtained by a search without a warrant, trial judge was not required, under the facts of this case, to interrupt the progress of the trial in order to hold a *voir dire* hearing into the lawfulness of the search.

15. **Searches and Seizures § 3; Criminal Law § 84— validity of search warrant — affidavit based on prior warrantless search — admission of evidence**

A search warrant whose affidavit was based in part upon an FBI laboratory examination of draperies obtained in a prior and valid search without a warrant, *held* lawful; consequently, evidence obtained by a search under the warrant was admissible.

16. **Homicide § 15— evidence relating to the character of the deceased — inadmissibility of evidence**

Testimony by defense witness relating to the length of time she had been dating the homicide victim and their actions on those occasions, *held* inadmissible on grounds of irrelevancy, the character of the victim not being in issue.

17. **Homicide § 15— exclusion of testimony relating to telephone call from homicide victim**

In a homicide prosecution in which the State attempted to show that the victim was killed on 15 June shortly after 8 p.m., exclusion of testimony that the victim had called a witness on the afternoon of the 15th was not prejudicial to defendant.

18. **Homicide § 15— competency of evidence — exclusion of questions relating to a supposed telephone call from the victim**

In a homicide prosecution in which the State attempted to show that the victim was killed on 15 June 1969, defendant was not prejudiced by the exclusion of questions relating to a supposed telephone

conversation on 17 June between a defense witness and the homicide victim, since the witness would have answered that she could not identify the caller.

**19. Criminal Law § 73; Homicide § 15— exception to hearsay rule — evidence of homicide victim's plans to go on a trip with defendant**

Testimony by the wife of a homicide victim that on the day of the homicide her husband told her of his plans to go on a business trip with the defendant, *held* admissible as an exception to the hearsay rule.

**20. Criminal Law § 169— admission of evidence not objected to**

It was not error to admit that portion of testimony to which no objection was interposed.

**21. Criminal Law § 169— waiver of objection — admission of similar testimony without objection**

The benefit of an objection seasonably made is lost if thereafter substantially the same evidence is admitted without objection.

**22. Criminal Law § 73— exceptions to hearsay rule**

The twofold basis for exceptions to the rule excluding hearsay evidence is necessity and a reasonable probability of truthfulness.

**23. Criminal Law § 73; Evidence §§ 11, 33— exception to hearsay rule — intentions of a decedent**

An exception to the hearsay rule permits the admission of a decedent's declarations to show his intention, when the intention is relevant *per se* and the declaration is not so unreasonably remote in time as to suggest the possibility of a change of mind.

**24. Evidence § 15— purpose of rules of evidence**

The purpose of the rules of evidence is to assist the jury to arrive at the truth.

**25. Homicide § 15; Criminal Law § 80— financial documents — genuineness of defendant's signature — lack of proof**

Various documents purporting to show financial transactions between the defendant and the homicide victim were improperly admitted in evidence when there was no testimony that defendant's signature on the documents was genuine.

**26. Criminal Law § 80— evidence relating to contents of documents that are incompetent**

Where financial documents were incompetent for lack of proof that defendant's signature thereon was genuine, it was error to permit testimony as to the contents of the documents and as to the fact that defendant's name appeared thereon as payee and as endorser.

**27. Homicide § 15— evidence relating to a debt controversy between defendant and homicide victim**

It was proper to admit a witness' testimony relating his business transactions with the defendant and the victim of a homicide—espe-

State v. Vestal

cially his testimony that he did not owe any indebtedness to the victim—where such testimony was relevant to the State's theory that the defendant and the victim had quarreled over a debt and that the two of them had set out to visit the witness with reference to the debt.

**28. Homicide § 20— photographs of victim's body — admissibility**

Photographs of a homicide victim's body that were taken while the body, wrapped in chains and in a gold drape, was floating in a lake and immediately after the body was pulled ashore, *held* admissible for the sole purpose of illustrating the testimony of witnesses.

**29. Homicide § 15— date of death — medical opinion testimony**

It was proper for the doctor who performed an autopsy on the victim's body to give his opinion as to the probable date of the victim's death and the probable lapse of time between the victim's eating of corn found in his stomach and the date and time of death.

**30. Criminal Law § 51— qualification of hair and fiber expert**

A special agent of the FBI who had conducted thousands of examinations and comparisons of hairs and fibers was properly found to be an expert in field of analyzing and comparing hairs and fibers.

**31. Criminal Law § 51— qualification of expert witness — conclusiveness of court's findings**

The court's finding that a witness is qualified as an expert will not be disturbed on appeal if there is evidence to show that, through study or experience, or both, he has acquired such skill that he is better qualified than the jury to form an opinion on the particular subject on which he testifies.

**32. Criminal Law § 51— testimony of fiber expert — admissibility**

A witness who qualified as an expert in the field of analyzing and comparing hairs and fibers was competent to testify as to his findings and opinions concerning the similarity of drapes found in defendant's warehouse with a drape found on a homicide victim's body.

**33. Criminal Law § 52— cross-examination of metallurgist**

On the cross-examination of an expert in metallurgy who had testified as to the similarity between the hooks and weights on the drapery found around defendant's body and the hooks and weights on the draperies found in defendant's warehouse, the trial court properly prevented defense counsel from asking the witness if he had examined the hooks on the draperies in his own home for such similarities.

**34. Homicide § 17— admission of threatening note written by victim — note undelivered to defendant — prejudicial error**

Defendant in a homicide case was prejudiced by the admission of a handwritten note found in the victim's car and apparently intended for the defendant but never delivered to him, the note expressing the victim's anger over a debt owed him by defendant and ex-

pressing the victim's determination to collect the money. The note is not admissible to show that the victim, in some other manner, communicated his anger to defendant and that defendant thereupon formed an intent to kill the victim.

**35. Criminal Law § 169— harmless admission of evidence**

It was not prejudicial to admit a witness' general statement that on the date of the homicide the victim had related his business dealings with the defendant, where similar evidence had been previously admitted without objection.

**36. Criminal Law § 169— testimony that defendant had moved back with his wife "to make a better show"**

The admission of a witness' testimony that it was her personal feeling that the defendant had "moved back" with his wife "because it would make a better show," *held* not substantially prejudicial under the facts of this homicide prosecution.

**37. Criminal Law § 112— instructions on reasonable doubt**

In the absence of a request by defendant that the court define the term "reasonable doubt," the court's failure so to charge was not error.

**38. Criminal Law § 118— instructions on contentions**

Errors in the court's statement of contentions must be called to the attention of the court so as to afford it an opportunity for correction.

**39. Homicide § 30— instructions on lesser degrees of homicide**

The court was not required to instruct on manslaughter where there was no evidence to sustain a verdict of manslaughter.

Chief Justice BOBBITT concurring in result.

Justices HIGGINS and SHARP join in concurring opinion.

APPEAL by defendant from *Johnston, J.,* at the 4 May 1970 Session of GUILFORD.

The defendant was indicted for the murder of Angelo S. Pennisi with premeditation and deliberation. He was found guilty of murder in the second degree and sentenced to imprisonment for a term of 25 years in the State's Prison.

The defendant relies upon 29 assignments of error. The pertinent facts relative to those requiring discussion in the determination of his appeal are set forth in the opinion.

*Attorney General Morgan, Assistant Attorney General Smith and Staff Attorney Satisky for the State.*

*Cahoon & Swisher by Robert S. Cahoon and James L. Swisher for defendant.*

LAKE, Justice.

### Denial of Motion for Judgment of Nonsuit

[1, 2] Upon the defendant's motion for judgment of nonsuit in a criminal action, the question for the court is whether there is substantial evidence of each essential element of the offense charged, or of a lesser offense included therein, and of the defendant's being the perpetrator of such offense. If so, the motion is properly denied. *State v. Rowland,* 263 N.C. 353, 139 S.E. 2d 661; *State v. Virgil,* 263 N.C. 73, 138 S.E. 2d 777; *State v. Goins* and *State v. Martin,* 261 N.C. 707, 136 S.E. 2d 97. In making this determination, the evidence must be considered in the light most favorable to the State and the State is entitled to the benefit of every reasonable inference to be drawn from it. *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469; *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679. Contradictions and discrepancies in the testimony of the State's witnesses are to be resolved by the jury and, for the purposes of this motion, they are to be deemed by the court as if resolved in favor of the State. *State v. Church,* 265 N.C. 534, 144 S.E. 2d 624; *State v. Simpson,* 244 N.C. 325, 93 S.E. 2d 425. In determining such motion, incompetent evidence which has been admitted must be considered as if it were competent. *State v. Cutler, supra; State v. Virgil, supra.*

[3, 4] The test of the sufficiency of the evidence to withstand the motion for judgment of nonsuit is the same whether the evidence is circumstantial, direct or both. *State v. Cutler, supra; State v. Rowland, supra; State v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431. There is substantial evidence of each element of the offense charged, or of a lesser offense included therein, and of the identity of the defendant as the perpetrator of it if, but only if, interpreting the evidence in accordance with the foregoing rule, the jury could draw a reasonable inference of each such fact from the evidence. *State v. Rowland, supra.* If, on the other hand, the evidence so considered, together with all reasonable inferences to be drawn therefrom, raises no more than a suspicion or a conjecture, either that the offense charged in the indictment, or a lesser offense included therein, has been committed or that the defendant committed it, the evidence is not sufficient and the motion for judgment of nonsuit should be allowed. *State v. Cutler, supra; State v. Chavis,* 270 N.C. 306, 154 S.E. 2d 340. The evidence in the present record, so con-

sidered, is sufficient to support, though not necessarily to require, findings as follows:

1. On 21 June 1969, the dead body of Angelo Pennisi was found floating in Lake Gaston between the bridges on which Highway 85 and U. S. Highway No. 1 cross the lake, having been submerged in the waters of the lake for a substantial period of time.

2. Wrapped around the body was a length of gold colored window drape and substantial lengths of heavy, metal, log chains, weighing approximately 70 pounds.

3. His pockets were empty except for a folded handkerchief and $32 in bills.

4. On the left side and the back of the head there were several lacerations (i.e., burstings or tearings of the skin as distinguished from cuttings), beneath which there were four or five separate, depressed fractures of the skull. These wounds were caused by blows from an instrument such as a hammer or a length of pipe. There had been four or five such blows upon the head, any one of which would have been sufficient to cause death.

5. The date of death was between four and eight days prior to 21 June.

6. The hour of death was from four to eight hours after Pennisi had a meal consisting in part of kernels of corn.

7. At approximately 1:30 p.m. on 15 June, Pennisi ate a lunch consisting in part of two servings of corn.

8. At 6:55 p.m. on 15 June, he left his home in Greensboro pursuant to his plan to travel by airplane that evening to Wilmington, Delaware, on business in the company of the defendant. He was then wearing the clothing found upon the body in the lake.

9. On 15 June, for approximately ten minutes, ending about 7:20 p.m., Pennisi was seen sitting in his automobile parked at the Summit Shopping Center conversing with a man in another car parked in the adjoining parking space. Between 7 p.m. and 7:30 p.m. he telephoned the defendant and at 7:30 p.m. drove to the defendant's home, parking in front of it. The defendant came out, got in the car, and they talked there until Pennisi

left shortly before 8 p.m. In that conversation Pennisi was "upset" over the title to a Lincoln automobile and "wanted" $6,000 which the defendant owed him. Immediately prior to 8 p.m. Pennisi was observed walking, in a very determined walk, up to the door of the defendant's flower shop, where he stopped abruptly, the flower shop being in the Summit Shopping Center. He was alone. No witness saw him alive thereafter.

10. After the discovery of Pennisi's body in the lake, a belt, similar in size and appearance to the one worn by Pennisi when he left his home on 15 June, broken near the buckle, was found in some tall weeds at a corner of the defendant's warehouse. No belt was found on the body.

11. Inside the warehouse, two blocks from the defendant's flower shop, the investigating officers found, on 26 or 28 June, some gold colored window drapes, which had been left there for storage by a friend of the defendant when she moved to another city. These drapes matched, in color, material, lining, design and stitching the drape found wrapped around Pennisi's body when it was taken from the lake. Among the drapes, so stored by the owner, was one of the size of the drape found wrapped around the body. A drape of that size was not found in the warehouse and none of those stored had been returned to the owner. Those found in the warehouse and the one found upon the body were equipped with the same type of hooks and weights, all the hooks having the same machine markings, indicating that they were all made by the same fabricating machine.

12. On 18 July, the investigating officers also found upon the ceiling and upon the north and west walls of the warehouse numerous spatters of blood, some of these containing hair. The blood was human blood. The several hairs found upon the walls of the warehouse matched, microscopically, hairs taken from Pennisi's body after its removal from the lake. The hairs so taken from the walls of the warehouse were of a Caucasian and, by their condition, showed they had been forcibly removed from the scalp.

13. On 15 June, the defendant owned a Cadillac Eldorado automobile, solid white both interior and exterior. In the trunk of this automobile investigating officers detected on 28 July 1969 a strong odor. From the carpet of the trunk they removed a human hair which, upon expert examination, was found to

match, microscopically, the hairs taken from Pennisi's head after the removal of the body from the lake. The investigating officers also found in the trunk of the white Cadillac a piece of sponge-like material containing a stain and other stains upon the rear trunk panel, which panel, made of cardboard, they removed for examination. They also removed from the trunk of the automobile the jack, several sections of the carpet and of the mat under the carpet. Upon expert examination, the piece of sponge-like material, the cardboard panel, the jack, the sections of carpet and the sections of the mat were each found to have human blood upon it.

14. The defendant's white Cadillac automobile was purchased for him, new on 9 June, the purchase being made by a woman friend in her name at his request. The defendant picked it up from her on 12 June. There was then no peculiar odor about it and she was not aware of any blood or hair in or about it. The mechanic of the dealer who sold it to her observed no unusual odor about it and no blood or hair as he serviced it for delivery. He installed the floor mats which he then removed from the trunk of the car. On 13 June, the defendant took it to a State inspector in order to get a State inspection sticker for it. The inspector did not observe any unusual odor then about the car. On that day the manufacturer's warranty for the car was transferred from the name of the woman, to whom it had been issued, to the defendant's name.

15. On 28 June, a friend of the defendant drove the white Cadillac to Mississippi on a trip which lasted nine days. At that time, the car had a strong odor in the trunk. This user of the car had nothing to do with putting any blood or hair in the trunk. On 18 July, the day the blood and hair were found and removed from the warehouse, the defendant sold the automobile to another friend, who resold it ten days thereafter to a Mr. Shropshire in whose possession the officers found it some two hours later. Shropshire noticed a bad odor about the car, such as cleaning fluid. He had nothing to do with putting any blood or hair in the trunk. He gave the officers permission to take the car into their custody and to search it, including the trunk.

16. On 15 June, the day Pennisi disappeared, another woman friend of the defendant saw the white Cadillac parked in front of the defendant's residence about 7 p.m. When she rode past the house again, as it was getting dark, the Cadillac

was gone. At a time after 8 p.m., a solid white, Cadillac Eldorado automobile, with a white vinyl top and white interior, was observed parked in the Summit Shopping Center near the defendant's florist shop. At 7:15 a.m. the next day, a neighbor observed the defendant driving his white Cadillac Eldorado along the street between their houses.

17. The defendant and Pennisi had had numerous business dealings with each other, including construction, purchases and sales of motels. These involved substantial amounts of money. Not all of their transactions had been reported properly for income tax purposes. At the time of his death, Pennisi held past due notes of the defendant's in the amounts of $70,000 and $40,879.37. A financial statement by Pennisi, dated 30 April 1969, showed Pennisi also held a note of Delaware State Wholesale Florist of Wilmington, Delaware, in the amount of $245,000 due on 15 June 1969, the date Pennisi disappeared after leaving home for the purpose of going on a business trip with the defendant to Wilmington. (The note would, of course, be due the following day, 15 June being Sunday.) This note was not offered in evidence. Its whereabouts were not shown. Pennisi also held at his death checks for $70,000 and $16,000, respectively, signed by the defendant on 15 January 1968, which checks had not been presented to the bank for payment.

18. The proprietor of Delaware State Wholesale Florist is Thomas Hatzis, called Tom. The defendant used the $70,000 loan made to him by Pennisi to pay off an earlier loan in that amount made to the defendant by Hatzis. Hatzis never had any business dealings with Pennisi except the sale to him of an automobile, for which Hatzis was paid by the defendant. The Delaware State Wholesale Florist (i.e., Hatzis) never owed Pennisi anything and Pennisi never owed Delaware State Wholesale Florist or Hatzis anything. Hatzis knew nothing about the above mentioned note of $245,000 held by Pennisi and supposedly due on 15 June 1969. Hatzis (i.e., Delaware State Wholesale Florist) never owed Pennisi a penny.

19. On 18 June, prior to the finding of Pennisi's body in the lake, an envelope bearing Pennisi's insurance agency's return address, with the defendant's name typed thereon and the word "IMPORTANT" hand printed thereon and also bearing on its face a handwritten notation, "Call me 27 26167 Now," was found on the front seat of the Ford automobile owned by Pennisi

and used by his son. The telephone number so shown was that of Pennisi's office. The envelope contained a sheet torn from Pennisi's appointment book for 1969. Upon this sheet was printed and written in Pennisi's handwriting and hand printing the following note:

> "I called Tom on June 12 at 11 a.m. He told me you've *already* collected my money. I want it this *morning*. Not tomorrow. I haven't slept all nite. So you better not come out with another lie on your mouth. You better call me right away."

Assuming, as the court must do upon the motion for judgment of nonsuit, that the jury were to find the above facts from the evidence, the jury could reasonably infer therefrom that Pennisi was murdered in the defendant's warehouse on 15 June 1969 at approximately 8 p.m. and that his body was carried from there to Lake Gaston in the trunk of the defendant's Cadillac. It could further reasonably infer that Pennisi, a few minutes earlier, in his conversation with the defendant in front of the defendant's residence, had demanded that the defendant go with Pennisi to Wilmington to see Hatzis with reference to Hatzis' denial that he had made the note for $245,000, held by Pennisi and supposed to be due the next day, and was also demanding payment of a large sum of money due Pennisi from Vestal. The jury could reasonably infer from the foregoing facts, if it found them to be established by the evidence, that in this conversation there were bad feelings and charges of bad faith directed by Pennisi to the defendant. It could reasonably infer that they parted to meet immediately at the defendant's warehouse for some further action in relation to these matters and that the defendant there struck and killed Pennisi. Whether these findings should be made from the evidence and these inferences drawn from such findings was a question for the jury and not for the trial court. Therefore, the motion for judgment of nonsuit was properly denied and this assignment of error is overruled.

### Admissibility of Evidence Obtained by Search of Warehouse

Captain Jackson of the Greensboro Police Department testified that on 26 or 28 June, approximately one week after the discovery of Pennisi's body in Lake Gaston, the defendant came to the Police Office, being fearful for the safety of his children, the cause of this uneasiness being undisclosed in the record.

State v. Vestal

Captain Jackson and Lieutenant Gibson talked with him and the defendant consented for them to look through his warehouse and his flower shop. They did so, the defendant accompanying them. They searched the warehouse in the presence of the defendant. Over objection to testimony as to the fruits of the search, without conducting a *voir dire* examination, the court permitted Captain Jackson to testify that, in the course of such search, the officers found, stored in the warehouse, three gold drapes used to cover articles of furniture stored there, which they took with the defendant's permission. These drapes were admitted in evidence over objection.

On 18 July, Captain Jackson again searched the warehouse, then having in his possession a search warrant, issued by a magistrate 18 July 1969. In the course of this search the officers discovered an additional drape similar to the ones previously taken and, upon the ceiling and walls of one corner of one room of the warehouse, numerous spatters of blood, some of which contained hair. These were removed from the warehouse. The drapes, the blood stains and hair were sent to the FBI laboratory in Washington for examination. Expert witnesses, who there made such examination, testified that in their opinion the drapes and linings were similar in composition, construction, design and stitching to the drape found upon Pennisi's body when it was taken from Lake Gaston and that the blood stains were human blood and the hair was human hair, microscopically like hair taken from the head of Pennisi's body after its removal from the lake.

After the selection of the jury, but in its absence and before any evidence was offered, the defendant moved to suppress the evidence so taken from the warehouse pursuant to the search warrant. This motion to suppress did not include the drapes taken on the officers' first visit to the warehouse. The court heard argument of counsel upon this motion but conducted no examination of witnesses with reference to the circumstances of either search, none being offered. It had before it the search warrant and the affidavit of Captain Jackson upon the strength of which the warrant was issued by the magistrate. The defendant's contention at the hearing of the motion was that the affidavit was, upon its face, insufficient to show probable cause for issuing the warrant.

The affidavit of Captain Jackson stated that he had "reliable information and reasonable cause to believe" that the defendant had "fibers, bloodstains, hairs, body fluids, drapes, personal effects of Angelo S. Pennisi, which constitute evidence of a felony, to-wit: murder in the first degree, and blunt instruments which were used in the commission of a felony, to-wit: murder in the first degree" in his warehouse, the location of which warehouse was specified. The affidavit further stated the following facts (summarized) "which establish reasonable grounds for issuance of a search warrant"; Pennisi disappeared from Greensboro at some time after 7:05 p.m. on 15 June 1969, at which time he was last seen alive by his family; his body was recovered from Lake Gaston on 21 June wrapped in a gold colored drape, bound with chains, with severe head wounds and bearing evidence of obvious murder; prior thereto the defendant had informed Detective Jenkins of the Greensboro Police Department that he had been with Pennisi at approximately 8 p.m. on 15 June at the defendant's home; Pennisi was last seen by any known witness at approximately 8 p.m. in the immediate vicinity of the defendant's flower shop, two blocks from the warehouse proposed to be searched; on 28 June, the defendant invited police to accompany him to the warehouse and there voluntarily turned over to the affiant three gold colored drapes, which were then located in the warehouse; these, together with the drape found upon Pennisi's body, were submitted to the FBI laboratory in Washington and were found to be similar in construction, composition and design to the drape in which Pennisi's body was wrapped when found; after being advised of his constitutional rights, the defendant told the affiant that Pennisi had a key to the warehouse.

The affidavit is attached to the warrant issued by the magistrate and is referred to therein as being so attached. The warrant states that the magistrate examined the affiant under oath and was "satisfied that there is probable cause to believe that the named person has such property on his premises described in the attached affidavit." The warrant was served and duly returned to the magistrate's office with a list of items taken from the warehouse in the course of the search made pursuant to the warrant.

In the argument of the motion to suppress, counsel for the defendant directed the court's attention to the fact that the

affidavit, upon which the search warrant was issued, recited that the defendant voluntarily turned over to Captain Jackson the three gold colored drapes upon Captain Jackson's first visit to the warehouse. Counsel contended that the affidavit was insufficient as to this obtaining of the drapes in that it did not show by clear and convincing evidence that the defendant's "consent was voluntarily and specifically given and was not the result of actual or implied coercion." In this argument defendant's counsel did not deny that the officers' first visit to the warehouse was with the consent of the defendant. No evidence on that point was offered by the defendant either upon the hearing of the motion to suppress or when the drapes were offered in evidence.

Article 4 of Ch. 15 of the General Statutes, which relates to search warrants, was rewritten by Ch. 869, § 8, of the Session Laws of 1969, which became effective 19 June 1969, approximately one month prior to the issuance of the search warrant in question. As so rewritten, G.S. 15-25 authorizes any magistrate to issue a warrant to search for "evidence, or instrumentality of crime upon finding probable cause for the search." G.S. 15-26, as so rewritten provides:

> "*Contents of Search Warrant.*— (a) The search warrant must describe with reasonable certainty the person, premises, or other place to be searched and the contraband, instrumentality, or evidence for which the search is to be made.

> "(b) An affidavit signed under oath or affirmation by the affiant or affiants and indicating the basis for the finding of probable cause must be a part of or attached to the warrant.

> "(c) The warrant must be signed by the issuing official and bear the date and hour of its issuance above his signature."

[5-7]   It is not contended that there is any failure of the warrant here in question to comply with the requirements of paragraph (a) and (c) of the statute. The affidavit complies with the requirements of paragraph (b). A valid search warrant may be issued upon the basis of an affidavit setting forth information which may not be competent as evidence. *State v. Bullard,* 267 N.C. 599, 148 S.E. 2d 565, *cert. den.,* 386 U.S. 917. The affi-

davit is sufficient if it supplies reasonable cause to believe that the proposed search for evidence of the commission of the designated criminal offense will reveal the presence upon the described premises of the objects sought and that they will aid in the apprehension or conviction of the offender. *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782; *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495; *State v. Bullard, supra.* The police officer making the affidavit may do so in reliance upon information reported to him by other officers in the performance of their duties. *State v. Banks,* 250 N.C. 728, 110 S.E. 2d 322. Similarly, he may state in his affidavit reports made to him by competent experts, such as the personnel of the FBI laboratories, concerning their examinations of materials forwarded by him to them for such examination and report. In *Brinegar v. United States,* 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879, the Supreme Court of the United States said: "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

In *Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, it was established that the Fourth Amendment to the Constitution of the United States forbids the admission in a criminal action, in a state court, of evidence obtained by an unreasonable search and seizure; i.e., a search made without a valid search warrant under circumstances requiring a warrant. That amendment provides that no search warrant shall issue "but upon probable cause, supported by oath or affirmation." As we said in *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376, *cert. den.,* 393 U.S. 1087, this was the law in North Carolina long before the Mapp decision. G.S. 15-27(a), as rewritten in 1969, provides: "No evidence obtained or facts discovered by means of an illegal search shall be competent as evidence in any trial."

In *Aguilar v. Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723, the Supreme Court of the United States dealt with questions concerning the Fourth Amendment requirements for obtaining a valid state search warrant. It said:

"[W]hen a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing court will accept evidence of a less 'judicially competent or persuasive character than would have justi-

State v. Vestal

fied an officer in acting on his own without a warrant,'
* * * and will sustain the judicial determination so long
as 'there was substantial basis for [the magistrate] to con-
clude that [the articles searched for] were probably pres-
ent.' * * *

"Although an affidavit may be based on hearsay in-
formation and need not reflect the direct personal observa-
tions of the affiant, *Jones v. United States,* 362 U.S. 257,
4 L. Ed. 2d 697, 80 S. Ct. 725, 78 ALR 2d 233, the magis-
trate must be informed of some of the underlying circum-
stances from which the informant concluded that the [ar-
ticles to be searched for] were where he claimed they were,
and some of the underlying circumstances from which the
officer concluded that the informant, whose identity need
not be disclosed, * * * was 'credible' or his information
'reliable.' "

[7]    Thus, there is no variance between the law of this State
as declared by the decisions of this Court, above cited, and the
requirements of the Fourth Amendment as interpreted by the
Supreme Court of the United States. The contention of the
defendant that the search warrant in the present case was
invalid upon its face due to the insufficiency of the affidavit
of Captain Jackson is without merit.

At the hearing of the motion to suppress the evidence
seized by the search pursuant to the search warrant, the de-
fendant offered no evidence nor did his counsel deny, in his
argument in support of his motion, Captain Jackson's sworn
statement in his affidavit that the draperies, taken by him on
his first visit to the warehouse, were "voluntarily turned over
to" him by the defendant, the defendant "having invited police
to accompany him to his warehouse" on that occasion. The
defendant's sole contention in his argument of the motion to
suppress the evidence was that the affidavit was insufficient
upon its face, in that it did not set out any other facts showing
that the defendant acted voluntarily on that occasion. Having
before it this statement under oath by this police captain, not
contradicted or denied, the court properly overruled the motion
to suppress the evidence.

When the trial got under way, Captain Jackson was called
by the State as its witness. He testified that the defendant, of

his own initiative, came to the police headquarters. He talked with Captain Jackson and Lieutenant Gibson "and while there he consented for [them] to go and look through his warehouse." He accompanied them as they searched the warehouse. At that point the defendant interposed his first objection to evidence as to what the officers found in the course of that search without a warrant.

[8, 9] Had there been no prior consideration of the validity of the searches of the warehouse, this objection would have necessitated an inquiry by the court, in the absence of the jury, to determine the validity of the search of the warehouse without a search warrant. Upon such *voir dire* hearing, the court should receive evidence and make findings of fact. The objection raised a preliminary question of fact for the determination of the trial judge, which it is his duty to resolve. *State v. Moore,* 240 N.C. 749, 83 S.E. 2d 912. See also *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1, *cert. den.,* 386 U.S. 911. In this respect there is no distinction between the admissibility of a confession and the admissibility of evidence obtained by a search without a warrant. The determining fact in each of these instances is whether the confession or the consent to the search was given voluntarily and without compulsion by the officers.

If the first search without a warrant was a violation of the defendant's constitutional right to be free from an unreasonable search and seizure, the second search was also unlawful because the affidavit upon which the warrant was issued recited and was largely based upon the fruits of the first search. It is the defendant's contention that the search warrant and the evidence produced by the second search, which it purports to authorize, were unlawful and inadmissible because they were fruit of a poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed. 2d 441; *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L. Ed. 319. We, therefore, must consider the validity of the first search of the warehouse.

[10-12] The owner of the premises may consent to a search thereof and thus waive the necessity of a valid search warrant so as to render the evidence obtained in the search competent. *State v. Colson, supra; State v. Moore, supra.* To have such effect, the consent of the owner must be freely and intelligently

given, without coercion, duress or fraud, and the burden is upon the state to prove that it was so, the presumption being against the waiver of fundamental constitutional rights. *State v. Little,* 270 N.C. 234, 154 S.E. 2d 61. However, the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed. 2d 694, in order to make competent a confession made in custody, need not be given by officers before obtaining the consent of the owner to a search of his premises. *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25.

[13] When the defendant consented to the first search of his warehouse by Captain Jackson and Lieutenant Gibson, he was not under arrest or otherwise in custody. He was charged with no criminal offense. He, not the officers, sought the interview. There is no suggestion that his concern for the safety of his family stemmed from any action by or fear of the police. At the hearing of his motion to suppress the evidence seized in the second search of the warehouse, the defendant did not move for suppression of the evidence seized in the first search and offered no evidence to contradict the sworn affidavit of Captain Jackson that it was with his consent and that he voluntarily surrendered to the officers the three drapes then taken. Had there been such evidence he could then have offered it with no prejudice whatever to the presentation of his case. When, at the trial, he objected to the introduction in evidence of the fruits of the first search, he made no request for the examination of the witness on *voir dire* and gave no intimation of a desire to offer thereon evidence that his consent was other than voluntary.

[13-15] While, ordinarily, as above noted, an objection to the admission in evidence of the fruits of a search without a warrant is sufficient to require an inquiry by the court, in the absence of the jury, into the validity of the search, under the circumstances of this case, the law does not require the trial judge to interrupt the progress of the trial for such purpose. As Justice Branch said in *State v. McCloud,* 276 N.C. 518, 173 S.E. 2d 753, "[O]rderly administration of justice demands that this rule [requiring a *voir dire* examination upon the interposing of an objection] be carefully applied so that planned, piecemeal defenses do not destroy certainty of punishment by causing the criminal courts to deteriorate into an endless series of *voir dire* hearings and mistrials." We, therefore, hold there was no error in the admission of the drapes obtained in the first search

of the warehouse and, consequently, the search warrant, valid upon its face, and the fruits of the search thereunder were not rendered invalid and incompetent by reason of the inclusion in the affidavit, upon which the search warrant was issued, of the statements concerning the finding of these drapes and their similarity to the one wrapped around the body of Pennisi.

*Examination of Annette West*

A material element of the State's case is its effort to establish that Pennisi was killed on Sunday, 15 June, shortly after 8 p.m. The State's evidence included testimony by Captain Jackson of a statement made to him by the defendant that the defendant talked to Pennisi between 7:30 and 8 p.m. on 15 June and that Pennisi then told the defendant he had a date with some woman that evening.

The defendant called as his witness Mrs. Annette West. She testified: She had known Pennisi since 1961; she saw him at her place of employment and "would see him after work on dates occasionally"; she saw him on dates on Tuesday and Friday nights of the week prior to 15 June; she talked with him on Sunday, 15 June.

[16] The defendant assigns as error the sustaining of numerous objections by the State to questions propounded to this witness by the defendant. Many of these related to the length of time during which she had been seeing Pennisi and to their actions on those occasions. These objections were properly sustained, the proposed testimony having no relevancy to the matter on trial, the character of Pennisi not being in issue. Evidence as to the general moral character of the deceased is not admissible in a prosecution for homicide. *State v. Hodgin,* 210 N.C. 371, 186 S.E. 495.

Pertinent questions related to the hour of the conversation on Sunday, 15 June, and to whether she talked with Pennisi by telephone on 17 June, two days after the date on which the State contends he was killed. Nothing else appearing, these questions were proper since the date and hour of Pennisi's death are material factors in the State's case. However, prior to these questions, the defendant was permitted to examine this witness in the absence of the jury upon these matters, and others. She then stated that the conversation on Sunday, 15 June, occurred in the afternoon and related to the making of

State v. Vestal

a date for Pennisi to pick her up at about 8 p.m., but he never came. On this *voir dire* examination, she also testified that she received a telephone call from a man on Tuesday, 17 June, but she "didn't catch the voice because [Pennisi] don't usually say anything like that" and, consequently, she terminated the telephone conversation. She acknowledged that she had previously told Captain Jackson that she "took" the person making the call on Tuesday to be Pennisi. The caller addressed her "Hi, Kid," Pennisi usually calling her "Kid."

[17, 18] The sustaining of the objections to the questions relating to the conversation on Sunday, 15 June, was not prejudicial to the defendant, since it occurred in the afternoon. On the contrary, had the witness been permitted to testify that Pennisi did not show up for the appointment at 8 p.m., this circumstance would have tended to strengthen the case for the State. The sustaining of the objections to the questions relating to the supposed telephone conversation on 17 June was not prejudicial to the defendant since the record shows the witness would have answered that she could not identify the caller on this date as Pennisi. On the contrary, her testimony would have been that while the caller addressed her as "Kid," the content of the conversation was so different from the customary conversation of Pennisi that she hung up the telephone. Far from being beneficial to the defendant, the jury might well have concluded from this testimony that someone was impersonating Pennisi so as to give the impression that he was still alive. There is no merit in this assignment of error.

### Testimony Concerning Pennisi's Travel Plans

[19] Mrs. Pennisi testified, without objection, that Pennisi left their home at 6:55 p.m. on Sunday, 15 June, that he took no suitcase but carried a shaving kit only, that prior to his departure she had some discussion with him in which he referred to a business trip, and that he was planning to go on a business trip to Wilmington, Delaware. Thereafter, over objection, she was permitted to testify that she expected him to return on Monday and that he was going on this trip with the defendant to see about an investment that he had made in that area. Subsequently, without objection, she testified that she became worried when her husband did not return Monday night.

[20, 21] The defendant assigns the admission of all of this testimony as error. It was not error to admit that portion of it

to which no objection was interposed. *State v. Perry,* 275 N.C. 565, 169 S.E. 2d 839; Stansbury, North Carolina Evidence, 2d Ed., § 27. As to testimony that Mrs. Pennisi expected her husband to return on Monday, it is sufficient to note that, subsequently, she testified, without objection, that she was worried when he did not return Monday night and on the following day advised her neighbor that he had not returned. It is the rule in this jurisdiction that the benefit of an objection, seasonably made, is lost if thereafter substantially the same evidence is admitted without objection. *State v. Williams,* 274 N.C. 328, 336, 163 S.E. 2d 353; *Shelton v. Railroad,* 193 N.C. 670, 139 S.E. 232; *Smith v. Railroad,* 163 N.C. 143, 79 S.E. 433; Stansbury, North Carolina Evidence, 2d Ed., § 30.

[22] Having testified that her husband left the house at 6:55 p.m. on Sunday, 15 June, prior to which he had made reference to a business trip, the solicitor asked, "Who did he say he would take this trip with?" Over objection, she replied, "He was going with Mr. Gloyd Vestal." The solicitor then asked, "Where did he indicate that he and Mr. Vestal were going?" Over objection, she was permitted to testify, "That afternoon he said that he was going to Wilmington, Delaware, with Mr. Gloyd Vestal to see about an investment that he had made in that area." Of course, this testimony by Mrs. Pennisi as to her husband's travel plans was hearsay. The twofold basis for exceptions to the rule excluding hearsay evidence is necessity and a reasonable probability of truthfulness. As Professor Morgan has said in 31 Yale Law Journal 229, 231, "If it is to be admitted, it must be because there are some good reasons for not requiring the appearance of the utterer and some circumstance of the utterance which performs the functions of the oath and the cross-examination." See also, Wigmore on Evidence, 3rd Ed., §§ 1420-1423; Stansbury, North Carolina Evidence, 2d Ed., § 144.

The subsequent death of Pennisi does not, of itself, make these statements by him admissible. 29 AM. JUR. 2d, Evidence, § 674. It does, however, establish the first basis of an exception to the hearsay rule—necessity; *i.e.,* the unavailability of the declarant as a witness. The circumstances under which the statements were made supply the reasonable probability of trustworthiness. It is a matter of everyday experience that a man leaving his home, or his business establishment, for an out-of-town trip will, for domestic and business purposes, inform his

family or business associates as to his destination, traveling companion, purpose and anticipated time of return. Such statements customarily have no purpose other than the orderly arrangement of his domestic and business affairs and their proper handling in his absence. It is this circumstance which supplies the required probability of truthfulness.

These statements by Pennisi to his wife as he was preparing to leave the house are relevant to the prosecution of the defendant for his murder, since they, if true, show that Pennisi left the house to join the defendant on a trip to Wilmington, Delaware, concerning a business matter in which they were interested. The State had previously introduced evidence of a statement by the defendant to Police Officer Jenkins prior to the time Pennisi's body was discovered. According to this testimony, the defendant acknowledged that Pennisi had come to his home at approximately 7:30 p.m. on 15 June and had requested the defendant to go with him to New York in connection with some problems involving Pennisi's parents. The testimony of Mrs. Pennisi, as to the destination and purpose of the trip contemplated by the deceased, was relevant to the questions of motive and of whether the defendant had truthfully narrated the substance of his conversation with Pennisi when talking to the investigating police officer. It would, of course, be for the jury to determine which, if either, was the correct statement as to the destination and purpose of the trip.

In *Mutual Life Insurance Company v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L. Ed. 706, suit was brought on a policy of life insurance and was defended on the ground that the insured, Hillmon, was not dead but, pursuant to a conspiracy to defraud the insurer, had killed his traveling companion, Walters, and left his body to be found at their camp site. The United States Supreme Court, on appeal from a judgment for the plaintiff-beneficiary, granted a new trial for error in excluding, as evidence, letters written by Walters to his sister and his fiancee, in which he wrote, "I expect to leave Wichita on or about March the 5th, with a certain Mr. Hillmon, a sheep trader, for Colorado or parts unknown to me." The Court said: "[W]henever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party."

In the Hillmon case, *supra,* the Court quoted with approval from the opinion of Chief Justice Beasley, speaking for the New Jersey Court of Errors and Appeals, in *Hunter v. State,* 40 N.J. Law 495. In that case, Hunter was indicted for the murder of Armstrong. The Court held there was no error in this admission of an oral statement by Armstrong to his son, in Philadelphia on the afternoon preceding the night of his murder, and a letter, written at the same time to his wife, each stating that Armstrong was going with Hunter to Camden on business, Chief Justice Beasley said:

> "In the ordinary course of things, it was the usual information that a man about leaving home would communicate, for the convenience of his family, the information of his friends, or the regulation of his business. * * * If it be said that such notice of an intention of leaving home could have been given without introducing in it the name of Mr. Hunter, the obvious answer to the suggestion, I think, is that a reference to the companion who is to accompany the person leaving is as natural a part of the transaction as is any other incident or quality of it. If it is legitimate to show by a man's own declarations that he left his home to be gone a week, or for a certain destination, which seems incontestable, why may it not be proved in the same way that a designated person was to bear him company?"

In *State v. Journey,* 115 Conn. 344, 161 A. 515, the defendant was on trial for the murder of one Buda, whose wife was permitted, over objection, to testify that when her husband left the house on the morning of the day of his death, he said he was going to work for Journey. In holding this was not error the Court said:

> "A declaration indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed. It is admissible, not as a part of the *res gestae,* but as a fact relevant to a fact in issue."

To the same effect are: *People v. Alcalde,* 24 Cal. 2d 177, 148 P. 2d 627 (murder victim's statement that she was going out with the defendant on the evening of her murder) ; *Smith*

*v. State,* 148 Ga. 467, 96 S.E. 1042 (homicide victim's statement to his wife, a short time before leaving home, that he and the defendant were "going over to the hollow to hide a still"); *People v. Fritch,* 170 Mich. 258, 136 N.W. 493 (statement by victim of murder by abortion of her intent to submit to such operation); *Commonwealth v. Trefethen,* 157 Mass. 180, 31 N.E. 961 (statement by deceased of her intention to commit suicide held admissible though not part of the *res gestae).*

In an exhaustive annotation in 113 A.L.R. 268, it is said at pages 273, 275 and 288, with numerous supporting citations:

"Evidence of the statements of a person since deceased with reference to the purpose or destination of a trip or journey, no matter how short, that he was about to make, has been admitted as competent in a considerable number of actions, both civil and criminal in character. * * *

"In 3 Jones on Evidence, § 1220, it is said that the declarations of a person when starting out on a journey, as to the destination or purpose of such journey, have sometimes been held admissible as characterizing the journey and as part of the *res gestae.* And this theory of *res gestae* is by far the most popular theory of admission, though possibly not as well reasoned as the theory that the declarations are admissible as original evidence, as an exception to the hearsay rule. * * *

"The theory of admission which has the approval of eminent text-writers is that statements made by a person since deceased, with reference to the purpose or destination of a journey or trip that he was about to take, are admissible as original evidence under an exception to the hearsay rule allowing proof of intention or motive."

Treatises and other writings supporting the admission of such statements by deceased persons as an exception to the hearsay rule, independent of the *res gestae* theory, include: Wigmore on Evidence, 3rd Ed., § 1725; McCormick on Evidence, § 270; Wharton on Criminal Evidence, § 289; Stansbury, North Carolina Evidence, 2d Ed., § 162; Professor Morgan's article in 31 Yale Law Journal 229, 233; Barrington, Note, 40 N. C. Law Review 812.

In *Gassaway v. Gassaway & Owen, Inc.,* 220 N.C. 694, 18 S.E. 2d 120, and in *Little v. Brake Co.,* 255 N.C. 451, 121 S.E. 2d 889, this Court held that statements by a deceased person as to the purpose and destination of the trip, upon which he was killed in an automobile accident, were not admissible in evidence in a proceeding under the Workmen's Compensation Act because not part of the *res gestae.*

In the Gassaway case, *supra,* the statement was made the night before the start of the trip and was heard by the wife and daughter of the deceased. Justice Barnhill, later Chief Justice, said the statement was not part of the *res gestae* because not connected with the immediate departure. The question in the Gassaway case, however, was whether the declarant was traveling to attend to his company's business as an employee within the protection of the Act or as an executive officer not within the protection of the Act. The statement in question threw no light whatever on that matter. In the Little case, Justice Parker, later Chief Justice, said the statement of the deceased in a telephone call to his wife, approximately half an hour before he left his motel to start on the journey which ended in the fatal accident, was not "so interwoven into his departure that it is vested with the significance of a fact, so as to constitute a part of the *res gestae,*" and was properly excluded. However, as shown in the opinion, the statement in question did not disclose where the customer, on whom the declarant intended to call, resided, and there was other evidence to indicate that he may already have been visited before the accident and that, at the time he was killed, the deceased was driving further to visit relatives.

In *Coley v. Phillips,* 224 N.C. 618, 31 S.E. 2d 757, this Court said:

> "For a declaration to be competent as part of the *res gestae,* at least three qualifying conditions must concur: (a) The declaration must be of such *spontaneous* character as to be a sufficient safeguard of its trustworthiness; that is, preclude the likelihood of reflection and fabrication; * * * (b) it must be *contemporaneous* with the transaction, or so closely connected with the main fact as to be practically inseparable therefrom * * * ; and (c) must have some *relevancy* to the fact sought to be proved. * * *

*"No rule of universal application can be devised as to the time element;* but the principle of relevancy to the fact sought to be proved by it admits of no relaxation." (Emphasis added.)

More specifically with reference to statements as to travel plans, it is said in an annotation in 163 A.L.R. 15, at page 21:

"A class of declarations which are often remote from the accident, yet so linked with it in continuity of action and proof as to be termed a part of the *res gestae,* are those which fall under the principle that if one, *when about to depart on a journey,* declares his intention as to his course of travel, his purpose, or his destination, the declaration is admissible as evidence that he followed that intention or purpose. Strictly speaking, the statement may be said to be part of the *res gestae of the departure,* but it is usually spoken of as part of the *res gestae* of the accident in general. * * *

"Under this general principle, the declaration, to be admissible, must have been made *at the time of departure* or *in preparation* therefor." (Emphasis added.)

[19, 23] In the present case, the statement by Pennisi was part of his preparation for departure. The nature of the statement supplies the probability of truth, which is the only function of the element of spontaniety mentioned in *Coley v. Phillips, supra.* We see no plausible basis for holding such a statement admissible if shouted back to the wife as the car leaves the driveway, but inadmissible if told to her at the dinner table or while packing the traveler's suitcase. The sound basis for its admission is not the *res gestae* doctrine, but the exception to the hearsay rule permitting the admission of declarations of a decedent to show his intention, when the intention is relevant per se and the declaration is not so unreasonably remote in time as to suggest the possibility of a change of mind.

In *State v. Dula,* 61 N.C. 211, the appeal was from a conviction of murder. The body of the deceased was found, several weeks after her disappearance, near "the Bates place." A witness was permitted to testify that, as the deceased rode by on the day she disappeared, she told the witness "she was on her

State v. Vestal

way to the Bates place; that the prisoner had returned just before day, was going another way and she expected to meet him at the Bates place." Chief Justice Pearson said: "The conversation between Mrs. Scott and the deceased ought not to have been admitted as evidence. At all events, no part of it except that the deceased said she was going to the Bates place." The reason given was that her statement as to where the defendant was and that she expected to meet him could not be "considered a part of the acts of the deceased;" *i.e.,* not a part of her act of riding along the road. On retrial, the statement, as to the destination of the deceased only, was admitted but, thereafter, the State withdrew it and the jury was instructed to disregard it. On the second appeal, 61 N.C. 440, it was said, "The evidence was admissible as part of the act;" *i.e.,* the act of the deceased in riding along the road.

The Dula case is distinguishable from the one now before us. *First,* the declaration of the deceased in that case as to the time of Dula's return and as to the route by which Dula was traveling to the Bates place has no counterpart in the statement by Pennisi in the case before us. *Second,* as to the declaration that the deceased expected to meet Dula at the Bates place— the portion of the statement relevant to the matter before us— the statement was made to an acquaintance casually passed en route. There was no showing of any reason for making it which would supply a reasonable probability of truthfulness. The statement by Pennisi, on the contrary, was made to the witness, his wife, under circumstances, which in and of themselves, supply a reasonable probability of truth.

It is the normal, natural, customary routine for a man leaving his home, or office, upon an out-of-town trip to inform some member of his family, or an employee or business associate, of where he is going, with whom and when he will return. Of course, the particular declarant on the particular occasion may falsely state these matters to his wife or to his business associate. The credibility of his statement on the particular occasion is always open to question, but that is a question for the jury. The fact that in the overwhelming preponderence of such instances the statement is true, because it has no purpose or significance except to promote the orderly conduct of the declarant's domestic or business affairs, supplies that reasonable probability of truth in the particular instance which justifies

the Court in permitting the jury to hear the statement and determine its truth or falsity.

The Dula decision was handed down by this Court more than a century ago. None of the authorities cited above was then in existence. The only exception to the hearsay rule discussed by our distinguished predecessors in their consideration of the Dula case was *res gestae*. We do not now reject the precedent of Dula insofar as the *res gestae* exception is concerned. We hold the testimony as to the statement by Pennisi, now under discussion, admissible under an exception to the hearsay rule developed and accepted, by other courts and by the eminent scholars in the field of Evidence cited above, since the Dula case was decided.

[24] No branch of the law should be less firmly bound to a past century than the rules of Evidence. The purpose of the rules of Evidence is to assist the jury to arrive at the truth. Exceptions to the hearsay rule, evolved by the experience and wisdom of our predecessors for that purpose, should not be transformed by us into rigid molds precluding all testimony not capable of being squeezed neatly into one of them. The Dula case can no longer be deemed authoritative in the factual situation before us.

The admissibility of Mrs. Pennisi's testimony as to her husband's statement concerning *his* travel plans is not predicated upon Vestal's contrary statement to the investigating police officer, though it is relevant to that matter also. Her testimony would have been admissible had Vestal made no statement whatever. Pennisi's statement, so recounted by her, was admissible to show that *Pennisi* had the intent to go to Wilmington to see about an investment he had made in that area, that *Pennisi* had the intent to go on that trip with Vestal, that *Pennisi* left home on that mission. It is competent evidence indicating that for such purpose Pennisi reached and entered into the company of Vestal on the night the State's evidence tends to show he was killed in Vestal's warehouse. It does not show, presumably was not offered to show and certainly would not be competent to show, that *Vestal* intended to go to Wilmington or set out upon such a trip.

It is immaterial that Pennisi never reached Wilmington. In this case his arrival there is not the fact at issue. What is at

issue is his association with Vestal that evening in Greensboro. The statement is relevant upon that matter and the circumstances under which it was made clothe it with a sufficient probability of truthfulness to permit the jury to hear it and to determine its truth or falsity. Consequently, there was no error in permitting Mrs. Pennisi to testify as to Pennisi's travel plans.

Consequently, there was no error in permitting Mrs. Pennisi to testify as to her husband's statement concerning his plan to travel with the defendant to Wilmington, Delaware, to see about an investment.

### *Admission of Financial Documents and Testimony Relating Thereto*

[25]    Over objection in each instance, the State was permitted to introduce in evidence the following exhibits:

No. 23, purporting to be a note made by the defendant to Pennisi for $70,000, due 15 January 1968;

No. 24, a "Financing Statement," purporting to be signed by the defendant to secure an undesignated obligation from him to Pennisi;

No. 25, a chattel mortgage, purporting to be given by the defendant to Pennisi to secure Exhibit 23;

No. 26, a document purporting to be signed by the defendant and to be an assignment by him to Pennisi of his rights under a contract with S. S. Kresge Company for the security of Exhibit 23;

No. 27, a note for $40,879.37, payable to Pennisi, dated 12 August 1968, due "October 1968," purporting to be signed by the defendant;

No. 28, a check signed by Pennisi, payable to the defendant, in the amount of $70,000, stating it is "for LOAN, due and payable Jan. 15, 1968" (see Exhibit 23), bearing the bank stamp "PAID" and purporting to be endorsed by the defendant and by T. Hatzis;

No. 29, a check signed by Pennisi, dated 22 January 1968, payable to the defendant, in the sum of $15,000, bearing the bank stamp "PAID" and purporting to be endorsed by the defendant;

No. 30, a check signed by Pennisi, dated 16 July 1968, payable to the defendant, in the amount of $50,000, bearing the bank stamp "PAID" and purporting to be endorsed by the defendant.

Attorney Julius Dees, Jr., testified for the State that he represented Pennisi and, at his request, drafted Exhibits 23 through 26 and, after Pennisi's disappearance, recorded No. 24 and No. 25 at the request of Mrs. Pennisi. He testified that they were not executed in his presence. Mr. Walter Faison, trust officer of North Carolina National Bank, which bank is co-executor of the Pennisi estate, testified that all of these exhibits, 23 through 30, were in the possession of the bank as such executor. After the exhibits were admitted in evidence, Mrs. Pennisi testified that Nos. 28, 29 and 30 were signed by Pennisi. No witness testified as to the genuineness of any purported signature of the defendant on any of these exhibits.

Police Officer Jenkins testified to an interview which he had with the defendant between Pennisi's disappearance and the discovery of his body. He testified that in this interview the defendant told him of various transactions in which he and Pennisi had participated, that he had "borrowed $50,000 at a time from Mr. Pennisi, but that at the present he was settled up with Mr. Pennisi except for" $6,000 which he owed Pennisi for a Lincoln Continental automobile. Officer Jenkins further testified that in this interview the defendant told him of his conversation with Pennisi between 7:30 p.m. and 8 p.m. on Sunday, 15 June, the date of Pennisi's disappearance, and that "Mr. Pennisi was upset over the title of a Lincoln automobile, and that he wanted $6,000 that Vestal owed him," and that he would pay Pennisi "even if he had to borrow the money from Mr. Tom Hatzis of Wilmington, Delaware," a mutual friend of the defendant and Pennisi.

These several documents were relevant to the State's contention that Pennisi and the defendant had been engaged in business transactions involving large sums of money and that the motive for Pennisi's murder grew out of those transactions. There is, however, no evidence in the record identifying the purported signature of the defendant upon any of these documents. The mere fact that his name appears on each document and the fact that the checks naming him as payee were paid by the drawee bank do not constitute proof of the genuineness

of his several signatures or proof that any of these documents actually passed through the defendant's hands. In the absence of such identification of these exhibits as having been signed or possessed by the defendant, their admission in evidence was error. *State v. Breece,* 206 N.C. 92, 173 S.E. 9; Strong, N. C. Index 2d, Criminal Law, § 80. Their admission in evidence was substantially prejudicial to the defendant. The fact that Pennisi's signatures upon Exhibits 28, 29 and 30 were not properly identified until after the exhibits were introduced in evidence would not have made their admission reversible error. *State v. Franks,* 262 N.C. 94, 136 S.E. 2d 623.

[26]	The documents being incompetent, it was error to permit the witness Faison to testify as to the contents thereof and as to the fact that the defendant's name (not his genuine signature) appeared upon the checks as payee and as endorser.

[27]	There was no error in the admission of the testimony of the witness Hatzis concerning his own business transactions with the defendant and Pennisi, this evidence being relevant to the State's contention as to the motive for the murder. The State had introduced, without objection, two financial statements given by Pennisi, each of which purported to show Pennisi held a note made by Delaware State Wholesale Florist (Hatzis' trade name) of Wilmington, Delaware, due 15 June 1969 (actually due the following day, 15 June being Sunday). This is the date on which the State contends Pennisi left his home with intent to go with the defendant to Wilmington, Delaware, to see about an investment. It was not error to permit Hatzis to testify that he did not owe Pennisi any sum whatever. This evidence was relevant to the State's contention that there was a controversy about the existence of the alleged indebtedness, and the purpose of Pennisi's trip to Wilmington in the company of the defendant was with reference to this controversy. Such evidence was clearly relevant to the question of motive for Pennisi's murder. Furthermore, the defendant recalled Hatzis as his own witness and, as such, had him testify that there was never any money due from Hatzis to either Pennisi or the defendant. Had there been any error in the testimony to this effect by Hatzis, when under interrogation by the State, the defendant lost the benefit of such error through introducing evidence to the same effect. *State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353; Stansbury, North Carolina Evidence, 2d Ed., § 30.

### Admission of Photographs in Evidence

[28]  Over objection, the State introduced in evidence five photographs of Pennisi's body while floating in Lake Gaston and immediately after it was pulled ashore, still wrapped in chains and in the gold drape. The defendant contends that these are inflammatory and were needlessly placed in evidence, since the defendant had offered to stipulate that the body was that of Pennisi and that the cause of his death was head injuries as contended by the State. The photographs were properly authenticated and were introduced for the sole purpose of illustrating the testimony of the authenticating witnesses. There was no error in admitting them for this purpose. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241; *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10. These exhibits were not excessive in number.

### Admission of Expert Opinion Testimony

[29]  The State introduced the testimony of Dr. Chapman, Assistant Chief Medical Examiner for the State of Virginia, who performed an autopsy on the body of Pennisi and who, over objection, testified as to his opinion concerning the probable date of death and the probable lapse of time between the eating by the deceased of corn, found in his stomach, and the death. There is no merit in the defendant's objection to the opinion testimony of this witness. The record shows that the defendant stipulated that he was an expert "doctor, physician and pathologist and forensic pathologist." The doctor's testimony as to his qualifications would have been sufficient to support such finding had there been no stipulation. His examination of the body of Pennisi was sufficient to serve as a basis for his opinion as to the date and time of death. *State v. Bright,* 237 N.C. 475, 75 S.E. 2d 407.

[30]  The State also called as its witness Frederick J. Wallace, who testified that he has been a Special Agent for the Federal Bureau of Investigation since October, 1963, and, as such, conducts microscopic examinations and comparisons of hairs and fibers at the FBI Laboratory, that he has conducted thousands upon thousands of such examinations, has testified as an expert in this field numerous times and that he received over a year of intensive training in the FBI Laboratory, under qualified examiners of the Hairs and Fibers Unit, until such time as it was recognized that he was competent to conduct examina-

tions on his own. The court found Mr. Wallace to be an expert in the field of analyzing and comparing hairs and fibers. The defendant assigns this finding as error. There is no merit in this contention.

[31, 32] The court's finding that a witness is qualified as an expert will not be disturbed on appeal if there is evidence to show that, through study or experience, or both, he has acquired such skill that he is better qualified than the jury to form an opinion on the particular subject as to which he testifies. *Paris v. Aggregates, Inc.,* 271 N.C. 471, 157 S.E. 2d 131; *State v. Moore,* 245 N.C. 158, 95 S.E. 2d 548; Stansbury, North Carolina Evidence, 2d Ed., § 133. There is in this record substantially more evidence of the expertness of Mr. Wallace than was present in the case of *State v. Mobley,* 273 N.C. 471, 160 S.E. 2d 334, cited by the defendant. Consequently, there was no error in permitting this witness to testify as to his findings and opinions concerning the similarity of the drapes found in the defendant's warehouse with that found upon the body of Pennisi, or as to the similarity of the hairs found in the warehouse and in the trunk of the defendant's automobile with hairs taken from the head of Pennisi's body.

[33] The State also called as its witness Frank DeRonja, a Special Agent for the Federal Bureau of Investigation, assigned to the Physics and Chemistry Section of the FBI Laboratory, his duties being the making of examinations of metals and metal products. He was found to be an expert in metallurgy and as to this finding the defendant interposed no objection. Mr. DeRonja testified that he examined the hooks and weights, found attached to or in the drape wrapped around Pennisi's body when it was taken from the lake, and the hooks and weights, attached to or found in the drapes taken from the defendant's warehouse. He testified that machine markings on these showed the hooks on all of the drapes were made by the same machines and that the weights on all of them were of the same size, type and construction. Upon cross-examination, he acknowledged that he has drapery hooks in his own home. The court sustained objections to questions by defendant's counsel as to whether he had examined the hooks on the draperies in his own home to see whether they bore the same characteristics and marks as those upon the drapes here in question. The defendant assigns this as error, contending that the court there-

State v. Vestal

by unreasonably curtailed his right of cross-examination. There is no merit in this assignment.

*Admission in Evidence of Note from Pennisi Found in Automobile*

[34]   Over objection, the State was permitted to introduce in evidence a note found between Pennisi's disappearance and the discovery of his body in Lake Gaston. It was found by a neighbor on the front seat of a Ford automobile owned by Pennisi. Pennisi's son had driven this automobile in the past but there was no evidence that anyone had driven it subsequent to Pennisi's disappearance or that Pennisi himself had ever driven it. Pennisi left home on 15 June in another automobile owned by him. At the time the note was discovered, Mrs. Pennisi, the finder and two other neighbors, were riding in the automobile. The driver picked up the envelope from the front seat. It contained another envelope, in which was the note.

There was no evidence as to who placed the envelope and note in the car or as to how long it had been there. The outer envelope bore the printed return address of Pennisi's insurance agency. On its face, in the space customarily used for the name and address of the intended recipient of a letter, appeared the typed name, "GLOYD VESTAL," the hand printed word, "IMPORTANT," and the message, handwritten and hand printed, "Call me 27 26167 Now," this being Pennisi's telephone number. The inner envelope bore the single word, "Vestal," and the names "Penny & Rosie," which latter names had been marked through. The note, contained in the inner envelope, was written upon a leaf torn from Pennisi's year book for 1969. The note was a mixture of handwriting and hand printing. Both the handwriting and the hand printing were identified as that of Pennisi. It read:

"I called Tom on June 12 at 11 a.m. He told me you've already collected my money. I want it this morning. Not tomorrow. I haven't slept all nite. So you better not come out with another lie on your mouth. You better call me right away before I get real mad. I had this put under your door at 3:30 a.m. on June 13th."

In the note the word "morning" is underlined four times and the word "mad" is underlined three times.

It is apparent that the statement in the note that the writer had it placed under the defendant's door was written in anticipation that this would be done and the messenger, instead, left it on the seat of the car. There is nothing in the record to indicate that the defendant received, saw or knew of the existence of the note. In his interview with Captain Jackson, above mentioned, he stated that he had talked to Pennisi on Saturday, 14 June, and had driven down to Myrtle Beach, South Carolina, that afternoon, returning to Greensboro on Sunday, 15 June, about 7 p.m., shortly before his conference with Pennisi in the latter's automobile, parked in front of the defendant's residence.

The relevance of this note to the State's contention as to the motive for the murder of Pennisi is apparent. From it an inference could be drawn that Pennisi had talked to Thomas Hatzis by telephone on 12 June with reference to the $245,000 note above mentioned and that Hatzis had told him the defendant had already collected Pennisi's money, that Pennisi had concluded the defendant had told him some falsehood about the matter and was demanding his money immediately from the defendant. It could be inferred further that Pennisi was angry with and suspicious of the defendant and was insisting that the defendant go with him to Wilmington, Delaware, to confer with Hatzis about this transaction, which trip the defendant did not desire to take. The record shows that the solicitor argued substantially this in his speech to the jury. Unquestionably, the introduction of this note into evidence was prejudicial to the defendant.

Obviously, the note is hearsay, being the extra-judicial statement by Pennisi, offered to prove the truth of its contents; that is, to prove the existence of facts which would justify resentment on the part of Pennisi toward the defendant and a state of mind on the part of Pennisi which, in their conversation on Sunday evening, 15 June, could have caused him to threaten the defendant in such manner as to cause him to desire the death of Pennisi. Indeed, it is double hearsay, being Pennisi's extra-judicial statement as to what "Tom" had told him. *Timber Co. v. Yarborough,* 179 N.C. 335, 339, 102 S.E. 630.

The admission of this note into evidence cannot be justified on the theory that it was a threat communicated to the defendant, for there is no indication in the record that the defendant ever saw it or knew about it. It can be regarded only

as an indication of Pennisi's state of mind, which is not shown to have been communicated to the defendant. Prior to the discovery of Pennisi's body in Lake Gaston, the defendant had stated to Police Officer Jenkins that at the time of his conversation with Pennisi on Sunday, 15 June, Pennisi "was upset over the title of a Lincoln automobile, and that he wanted $6,000 that Vestal owed him." This does not, however, indicate that the defendant knew of the note found in the Pennisi automobile, or of Pennisi's claim against Hatzis.

What the State is here undertaking to do is to use a statement by Pennisi to show Pennisi's state of mind and, from that, to draw an inference that Pennisi, in some other manner, communicated to the defendant this state of Pennisi's mind and, upon that supposition, to infer the formation by the defendant of a determination to kill Pennisi. The use of a written statement by the deceased, uncommunicated to anyone, as the basis upon which to build first a supposition of another, unproved communication with the defendant and then to erect, upon that supposition, an inference as to the defendant's state of mind carries the superstructure beyond limits supported by that degree of credibility which is required for an exception to the hearsay rule. See: *Sowers v. Marley*, 235 N.C. 607, 70 S.E. 2d 670; 29 AM. JUR. 2d, Evidence, § 161. We, therefore, hold that it was prejudicial error to admit this note in evidence.

### Miscellaneous Objections to Evidence

[35]   The defendant assigns as error that the court permitted Maurice Miller to testify, over objection, that when he visited Pennisi in the latter's home about 6 p.m. on Sunday, 15 June, Pennisi discussed, with Miller, Pennisi's business relations with the defendant. The witness did not state the nature of that discussion. He had previously testified, without objection, that Pennisi had discussed with the witness his business relations with the defendant on several occasions. In view of this testimony and the testimony of Captain Jackson and Police Officer Jenkins as to their interviews with the defendant, in which the defendant related in detail many business transactions with Pennisi, the admission of Miller's general statement that on Sunday, 15 June, Pennisi discussed, with Miller, his business relations with the defendant was not prejudicial.

[36]   The defendant assigns as error the admission, over objection, of Ethel Emerson's testimony that her own personal feel-

ing was that the defendant had "moved back" with his wife "because it would make a better show." The conclusion of the witness as to the defendant's reason for returning to his home was not competent. *Wood v. Insurance Co.*, 243 N.C. 158, 90 S.E. 2d 310; *State v. Cuthrell*, 233 N.C. 274, 63 S.E. 2d 549; Stansbury, North Carolina Evidence, 2d Ed., § 124. Nevertheless, in view of Captain Jackson's testimony concerning the defendant's own statements to him, in the presence of Mrs. Vestal, as to his associations with "Ethel" and Gail Hoyle, plus others unnamed, the statement in question by this witness cannot be deemed substantially prejudicial to the defendant's general character in the eyes of the jury.

The defendant assigns as error the admission, over objection, of the testimony of Lieutenant Gibson to the effect that Mrs. Stanley and her daughter, Miss Cox, were shown a number of pictures, from which they identified one of the defendant's white Cadillac as a picture of the car they had seen in the vicinity of the defendant's flower shop at approximately 8 p.m. on Sunday, 15 June, and that, thereafter, while riding with him, they identified the defendant's car, then meeting them in a line of traffic. Mrs. Stanley and Miss Cox had previously testified that they saw a white Cadillac in the vicinity of the defendant's flower shop on Sunday, 15 June, at a time identified as approximately 8 p.m. Mrs. Stanley had testified also that, subsequently, while riding with Lieutenant Gibson and her daughter, she saw and identified this car, and pointed it out to Lieutenant Gibson, as they met it on the highway. The testimony of Lieutenant Gibson, to which the defendant objected, was sufficiently corroborative of the testimony of Mrs. Stanley to justify its admission. See *State v. Brown*, 249 N.C. 271, 106 S.E. 2d 232.

There is no merit in any of these assignments of error.

### Exceptions to the Charge to the Jury

[37-39]   Since there must be a new trial for the errors above noted in the admission of evidence, it is not necessary to discuss in detail the assignments of error relating to the charge to the jury. We have examined these and find no error therein. The court gave, in substance, all instructions requested by the defendant. There was no request that the term "reasonable doubt" be defined and, in the absence of such request, the failure to include a definition of the term in the charge was not error.

*State v. Potts,* 266 N.C. 117, 145 S.E. 2d 307; *State v. Browder,* 252 N.C. 35, 112 S.E. 2d 728. None of the alleged errors in the court's statement of the contentions of the State and of the defendant were called to the attention of the court so as to afford it an opportunity for correction. *State v. Butler,* 269 N.C. 733, 153 S.E. 2d 477. There being no evidence in the record to sustain a verdict of manslaughter, it was not error for the court to omit manslaughter from the possible verdicts which the jury might return. *State v. Smith,* 268 N.C. 167, 150 S.E. 2d 194; *State v. Summers,* 263 N.C. 517, 139 S.E. 2d 627; Strong, N. C. Index 2d, Criminal Law, § 115.

### Other Assignments of Error

The remaining assignments of error brought forward in the defendant's brief are either formal or relate to matters which are unlikely to arise upon the retrial of the case and, therefore, need not be discussed.

For the errors above noted in the admission of the State's Exhibits 23 to 30, inclusive, and the note found in the Pennisi automobile, the State's Exhibits 93, 94 and 95, there must be a new trial.

New trial.

Chief Justice BOBBITT concurring in result.

I agree that the admitted circumstantial evidence, when considered in the light most favorable to the State, was sufficient to withstand defendant's motion for judgment as in case of nonsuit and to warrant submission of the first degree murder charge as well as the lesser included offenses of second degree murder and manslaughter.

I agree also that the admission in evidence of the note and envelopes found in a Pennisi car between the date of Pennisi's disappearance (June 15th) and the date his body was found in Lake Gaston (June 21st) was prejudicial error and, standing alone, is sufficient to require a new trial. The facts with reference thereto are set forth in the majority opinion. Suffice to say, the contents of Pennisi's uncommunicated written statements concerning his relationship with defendant were properly rejected as hearsay. The effect of the erroneous admission thereof was to allow Pennisi to testify at trial through the medium of his identified writings.

I disagree with that portion of the majority opinion which holds competent all of the testimony of Mrs. Pennisi as to what Pennisi told her on Sunday, June 15th, and in doing so undertakes to approve generally an exception to the hearsay rule heretofore unrecognized in this jurisdiction and which, in my opinion, is wholly inapplicable to the present factual situation and portends dangerous consequences.

The question here is whether Pennisi should have been permitted to testify through the medium of his wife's testimony concerning his plans for Sunday, June 15th. Admittedly, this is hearsay testimony. In my view, such testimony should be admitted only under the most compelling circumstances and then only under strict limitations.

The general rule the majority opinion seeks to establish is stated and approved in *State v. Journey,* 115 Conn. 344, 161 A. 515 (1932), where Journey appealed from his conviction for murder in the first degree. The widow of Buda, the deceased, when asked on direct examination what her husband said when he left home the morning he died, was permitted to testify over the defendant's objection "that he said he was going to work for Journey." Later that day, Buda's body was found in the ruins of an old barn on abandoned property. The evidence was that his death had been caused by gunshot wounds, not by burning. There was circumstantial evidence tending to show that Buda and the defendant had been together that morning. *In addition,* the evidence included testimony that defendant admitted to officers "that he had killed Buda, but had no good reason for doing so." A new trial was awarded on the ground there was no evidence of premeditated murder.

With reference to the admission of the widow's testimony as to Buda's declarations, the court said: "The existence of a plan or intention to do a thing is relevant to show that the act was probably done as planned. The plan or intention, being a condition of mind, may be evidenced, under an exception to the hearsay rule, by the person's own statement as to its existence. *A declaration indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed.* It is admissible, not as a part of the *res gestae* but as a fact relevant to a fact in issue. (Citations omitted.) A fact in issue in the case was whether Buda was in the company of the accused on the morning in question. His

State v. Vestal

plan or intention to go to his house was a fact relevant to a fact in issue, and his own declaration that such was his intention was admissible in proof of such relevant fact." (My italics.)

In accord with Journey, other cases cited in the majority opinion hold that such declarations of a present intention to do a particular act in the immediate future are admissible *to prove that the act was in fact performed.*

An evaluation of the rule stated in the quoted excerpt from *State v. Journey, supra,* will be set forth below. Whatever its merits, the rule does not apply in the present factual situation.

When first examined, Mrs. Pennisi testified that on Sunday, June 15th, Pennisi was planning to leave that evening at six o'clock to go to Wilmington, Delaware, on a business trip; that, "around 5 o'clock," he received a phone call and, as a result thereof, "(t)he time he was to leave changed"; that at 6:55 he left the house, "went out one door and came back in another and got his raincoat . . . and then he left again"; and that he took with him a shaving kit but no suitcase.

Later, Mrs. Pennisi, upon recall for further testimony, was permitted to testify, over defendant's objections, that Pennisi, before leaving the house on Sunday, June 15th, said that he was going on a business trip "with Mr. Gloyd Vestal"; that during the previous week she and Pennisi had discussed this trip "(s)everal times"; and that during the afternoon of that day he said he was going to Wilmington, Delaware, with "Mr. Gloyd Vestal to see about an investment that he had made in that area."

Immediately after Mrs. Pennisi's testimony upon recall, the State offered the testimony of Captain W. H. Jackson, an investigating officer, who testified to his conversation with defendant in Jackson's office on *July* 14, 1969. Jackson testified, *inter alia,* that defendant told him that on Saturday, June 14th, Pennisi had come by and talked with him, saying "that he was having trouble with his brothers and his father in New York and wished (Vestal) to go there with him"; that Vestal then agreed to make the trip to New York with Pennisi; that Vestal telephoned Pennisi later and told him he could not make the trip; that on Sunday, June 15th, about 8:00 p.m., Pennisi drove up in front of defendant's home; and that defendant got in the car with Pennisi and they talked "about various things," Pen-

nisi stating, *inter alia,* that he would not be going to New York until the following day.

The *fact* that Pennisi told his wife he was going to Wilmington, Delaware, on a business trip with no luggage other than a shaving kit would be competent to explain (1) why she was not disturbed by Pennisi's absence until after he failed to come home when expected, that is, on the night of Monday, June 16th, and (2) why she waited until Wednesday, June 18th, before she reported Pennisi's absence to the Greensboro Police Department.

The State contends, and its evidence tends to show, that Pennisi was killed in Greensboro on the night of Sunday, June 15th. Whether Pennisi went to Wilmington, Delaware, on Sunday, June 15th, for any purpose, with or without defendant, *was not a fact in issue.* The testimony as to what Pennisi told his wife was not offered to prove that Pennisi *went* to Wilmington, Delaware, on Sunday, June 15th. The impact of this testimony was to show that defendant's statements to Captain Jackson as to a proposed trip with Pennisi *to New York* and *the purpose thereof* was in conflict with Pennisi's statements to his wife as to a proposed trip with Vestal to Wilmington, Delaware, and *the purpose thereof.* In my opinion, the statements attributed to Pennisi by his wife were not competent to show the falsity of the conflicting statements attributed to defendant by Captain Jackson and the admission thereof under the circumstances was prejudicial error.

Whatever is said in this case concerning the rule stated in the quoted excerpt from *State v. Journey, supra,* must be considered *dicta* in later cases involving factual situations in which that rule might be pertinent. However, the approval of that rule in the majority opinion impels me to consider it on its merits and in the light of its conflict with our decisions.

Decisions cited in the majority opinion, in addition to *State v. Journey, supra,* include *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 36 L. Ed. 706, 12 S. Ct. 909 (1892) ; *Hunter v. State,* 40 N.J.L. 495 (1878) ; *Commonwealth v. Trefethen,* 157 Mass. 180, 31 N.E. 961 (1892) ; *People v. Alcalde,* 24 Cal. 2d 177, 148 P. 2d 627 (1944).

In Hillmon, a much discussed decision (see Maguire, The Hillmon Case—Thirty-Three Years After, 38 Harvard Law Re-

view 709 *et seq.),* the insurance companies, as a defense to actions on the policies to recover death benefits, asserted that Hillmon, the insured, was not dead but was alive and in hiding. Decision turned upon whether the body found at Crooked Creek on the night of March 18, 1879, was the body of Hillmon, as asserted by plaintiff, or the body of Walters, as asserted by the defendants. Much conflicting evidence was offered as to the identity of the body. The plaintiff also proffered evidence that Hillmon and Brown had been traveling together through southern Kansas in search of a site for a cattle ranch and that on March 18th, while they were in camp at Crooked Creek, Hillmon was killed by the accidental discharge of a gun. The defendants offered evidence that Walters had left his home and his betrothed in Iowa in March, 1878, and was afterwards in Kansas until March, 1879; that during that time he corresponded regularly with his family and his betrothed; that the letters received from him included one received by his betrothed on March 3rd, and postmarked at Wichita on March 2nd, and one received by his sister about March 4th or 5th, and dated at Wichita a day or two before; and that he had not been heard from since. The last letter of Walters to his sister included a statement that he expected "to leave Wichita on. or about March the 5th, with a certain Mr. Hillmon, a sheep-trader, for Colorado or parts unknown to (him)." The last letter from Walters to his betrothed included a statement that he was "going with a man by the name of Hillmon, who intends to start a sheep ranch"; that Hillmon had promised him more wages than he could make at anything else; and that he would be able to get "to see the best portion of Kansas, Indian Territory, Colorado, and Mexico."

Upon objection by the plaintiff, the trial judge excluded these letters from Walters to his sister and betrothed. The Supreme Court of the United States held these letters should have been admitted in evidence; and, on account of the exclusion of these letters and on account of another (unrelated) error, the defendants were awarded a new trial. The following excerpts from the opinion of Mr. Justice Gray are noted.

"The evidence that Walters was at Wichita on or before March 5, and had not been heard from since, together with the evidence to identify as his the body found at Crooked Creek on March 18, tended to show that he went from Wichita to Crooked Creek between those dates. Evidence that just before March 5

he had the intention of leaving Wichita with Hillmon would tend to corroborate the evidence already admitted, and to show that he went from Wichita to Crooked Creek with Hillmon. Letters from him to his family and his betrothed were the natural, if not the only obtainable evidence of his intention. . . .

"The letters in question were competent, not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention. In view of the mass of conflicting testimony introduced upon the question whether it was the body of Walters that was found in Hillmon's camp, this evidence might properly influence the jury in determining that question."

In Hillmon, Mr. Justice Gray quotes a portion of the opinion of Chief Justice Beasley in *Hunter v. State, supra* at 538. The New Jersey Court of Errors and Appeals affirmed the judgment of the Court of Oyer and Terminer where Hunter had been convicted of the first degree murder of John M. Armstrong. On appeal, Hunter assigned as error, *inter alia,* the admission of evidence of statements made by Armstrong in Philadelphia to his son during the afternoon of January 23rd and of evidence as to statements in a letter written by Armstrong to his wife that afternoon, both to the effect that Armstrong was going to Camden, New Jersey, that night with Hunter. The State's evidence tended to show that Armstrong was killed that night in or near Camden.

The two sentences of the opinion of Chief Justice Beasley which precede the portion quoted by Mr. Justice Gray (and brought forward in the majority opinion herein) are as follows: "The present point of inquiry therefore is, whether these declarations of Mr. Armstrong to his son, and the similar declaration contained in the note to his wife, can reasonably be said to be component parts, or the natural incidents of the act of the deceased in going to Camden, which act was incontestably a part of the *res gestae*. After mature reflection and a careful examination of the authorities, my conclusion is, that these communications of the deceased should be regarded as constituents of that transaction, for I think they were preparations for it,

and thus were naturally connected with it." In concluding this portion of the opinion, Chief Justice Beasley observed: "It is principally from the foregoing considerations that I find myself constrained to think that the declarations under discussion, even if they stood in the case unsupported or unaffected by other circumstances, were admissible, on general principles, on the single ground that they were the natural and inartificial con-comitants of a probable act, which itself was a part of the *res gestae*. In such a *status* of the evidence, I should think that the exception to the principle that rules out hearsay, *had been carried to its extreme limit, but without transcending such limit.* But, in point of fact, the question thus discussed is not, on this record, presented in this narrow point of view, for it is, in the proofs, connected with facts that appear to put the admissibility of these declarations on a stable foundation." (My italics.) There was evidence tending to show that Hunter had proposed to Armstrong that they go together to Camden on the night of the murder. Declarations of Armstrong were held competent and were admitted to show a mutual understanding to that effect.

In *People v. Alcalde, supra,* Florencio "Frank" Alcalde was convicted of murdering Bernice Curtis, whose dead body was found on the morning of November 23, 1942. The defendant contended that prejudicial error was committed by admitting in evidence over objection the declarations of the deceased made on November 22nd that she was going out with "Frank" that evening. The majority opinion disposes of this contention in these words: "In overruling the objection the court took the precaution to state in the presence of the jury that the evidence was admitted for the limited purpose of showing the decedent's intention. It is argued by the defendant that declarations not under oath, made when the declarant is not confronted by the adverse party, are admissible to prove physical or mental con-dition and only when either condition is a matter in issue. The admission of such utterances, due caution having been taken by the court as here, is not so limited." There was independent cir-cumstantial evidence that the defendant was at the scene where the body was found.

I am impressed by the force of the dissenting opinion of Justice (later Chief Justice) Traynor in *People v. Alcalde, supra,* which includes the following: "A declaration of intention is admissible to show that the *declarant* did the intended act,

if there are corroborating circumstances and if the declarant is dead or unavailable and hence cannot be put on the witness stand. . . . A declaration as to what one person intended to do, however, cannot safely be accepted as evidence of what another probably did. . . . The declaration of the deceased in this case that she was going out with Frank is also a declaration that he was going out with her, and it could not be admitted for the limited purpose of showing that she went out with him at the time in question without necessarily showing that he went with her. In the words of Mr. Justice Cardozo, 'Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed.' *Shepard v. United States,* 290 U.S. 96, 104, 54 S. Ct. 22, 25, 78 L. Ed. 196. Such a declaration could not be admitted without the risk that the jury would conclude that it tended to prove the acts of the defendant as well as of the declarant, and it is clear that the prosecution used the declaration to that end. There is no dispute as to the identity of the deceased or as to where she was at the time of her death. Since the evidence is overwhelming as to who the deceased was and where she was when she met her death, no legitimate purpose could be served by admitting her declarations of what she intended to do on the evening of November 22d. The only purpose that could be served by admitting such declarations would be to induce the belief that the defendant went out with the deceased, took her to the scene of the crime and there murdered her. Her declarations cannot be admitted for that purpose without setting aside the rule against hearsay."

It is noted that the views expressed by Justice Traynor are those applied by Chief Justice Pearson in *State v. Dula,* 61 N.C. 211 (1867), and *State v. Dula,* 61 N.C. 437 (1868), discussed below.

Although not cited in the majority opinion, *State v. Farnam,* 82 Or. 211, 161 P. 417 (1916), involves questions similar to those heretofore considered. Upon appeal, the plaintiff's conviction of manslaughter was affirmed. The majority held competent the declarations of the deceased that she could not go home with Mabel that night "because she thought Roy (Farnam) was coming down." The body of the deceased was found the next morning in the ruins of a barn which had burned dur-

State v. Vestal

ing the night. Decisions cited in the concurring opinion of Justice Harris to support the majority view include Hillmon and Hunter. Decisions to the contrary are cited in the dissenting opinion of Justice Burnett. Justice Harris, speaking for the majority, stated: "Even though it be assumed that the testimony moved against was incompetent, nevertheless the defendant is in no position to claim that he was materially prejudiced by it." There was independent evidence that the defendant had been to the scene where the body was found.

Justice Harris added: "If evidence is competent for one purpose, it cannot be rejected merely because it is not competent for another purpose. Being competent to show what Edna Morgan intended to do, the testimony of Mabel Barton was not rendered incompetent for all purposes merely because it was incompetent for the purpose of connecting Roy Farnam with the alleged crime, *although it would have been proper to instruct the jury to limit the evidence to the sole purpose for which it was competent, and a failure to give a requested instruction to limit the application of the evidence to the single purpose for which it is admissible would be error; but here the contention is that the testimony was not competent for any purpose.*" (My italics.)

An additional statement from the opinion of Justice Harris is noted: "Declarations, like the one considered here, are, by many, and perhaps, by most, of the authorities, admitted as part of the *res gestae;* they are spoken of by some as verbal acts; they are characterized by others as original evidence admissible as an exception to the hearsay rule." Thus, the admission of the declarations in *State v. Journey, supra,* was on the ground that they constituted original evidence admissible as an exception to the hearsay rule. On the other hand, in *Hunter v. State, supra,* which is cited and relied on in Journey, the admissions were held properly admitted as part of the *res gestae.*

The question presented in *Commonwealth v. Trefethen, supra,* is sufficiently different to warrant full consideration of that case. Trefethen was convicted of the first degree murder of Deltena J. Davis (Deltena). Circumstantial evidence offered by the Commonwealth tended to show that Deltena, who was unmarried, left her home on December 23, 1891; that she was then "about five months advanced in the state of pregnancy"; that her body was found in the Mystic River on January 10,

State v. Vestal

1892, about three miles from her home; that the cause of her death was drowning; and that "(t)here were no marks of violence on the body when found, nor was there any evidence that poison had been administered, nor did her clothing show any signs of violence." 157 Mass. at 182, 31 N.E. at 962. The defendant offered a witness who testified to a conversation she had with Deltena on December 22nd. When objection was made to the testimony of this witness, counsel for the defendant stated to the court, in the absence of the jury, that they offered to prove by this witness that, at the interview on December 22nd, Deltena "stated to the witness that she was five months pregnant with child, and had come to consult as to what to do, and added later in the interview that she was going to drown herself." The verdict was set aside for error in excluding the testimony of this witness.

The defendant's counsel did not contend, nor did the court hold, that the statements attributed to Deltena were admissible as part of the *res gestae*. They contended "that the declaration is some evidence of the state of mind or intention of the deceased at the time she made it; that the intention which it tends to prove is a material fact, which, in connection with other facts proved, tends to support the theory of suicide; and that the state of mind or intention in the mind of a person, when material, can be proved by evidence of his declarations, as well as of his acts, particularly when that person has deceased and cannot be called as a witness, and the declarations were made before the controversy arose which is the subject of the trial." Accepting this contention, the court held: "The fundamental proposition is, that an intention in the mind of a person can only be shown by some external manifestation, which must be some look or appearance of the face or body, or some act or speech; and that proof of either or all of these for the sole purpose of showing state of mind or intention of the person is proof of a fact from which the state of mind or intention may be inferred."

In my opinion, the admissibility of evidence of statements attributed to a deceased person where *the statements themselves* indicate the declarant's state of mind, *e.g.*, that he was confused, distraught, hysterical, mad, etc., when he made them, and his state of mind at that time was an evidential fact material to the fact in issue, is a different question from that presented where the testimony as to the deceased's declarations is offered

solely for the purpose of showing that the deceased in fact later did what he declared he intended or planned to do. In Trefethen, it was conceded the declarations of Deltena were not competent as evidence that she had killed herself. It was held they were competent as indicating her state of mind when she made the statements; and that her state of mind at that time was an evidential circumstance which, when considered with other evidence in the case, was competent as bearing upon whether Deltena committed suicide. It is noted that the statements attributed to Deltena did not involve any other person.

In my opinion, Journey, Hillmon, Hunter, Alcalde and Farnam may be considered authority for this statement from McCormick, Law of Evidence, Hornbook Series, § 270 at 575-576 (1954), to wit: "Whenever declarations of intention are offered *as evidence of the declarant's subsequent conduct* the question of admissibility of the evidence should be clearly discriminated from its sufficiency to support a finding that such conduct occurred. Standing alone such declarations would in the usual situation manifestly be insufficient to warrant such a finding, and accordingly it is frequently said that declarations of intention are admitted in corroboration of other evidence to show such acts. Insufficient as they frequently are, separately considered, they nevertheless may be significant contributions to an aggregation of evidence sufficient to establish the act and the identity of the actor, and as such they will generally be admitted." (My italics.)

If there had been independent evidence that Pennisi was killed in Wilmington, Delaware, then, assuming the rules stated in the decisions discussed above were adopted by this Court, deceased's declarations on Sunday, June 15th, of his intention to leave that day for Wilmington, Delaware, with defendant would have been admissible *as tending to show he acted in accordance with his declared intention.* The evidence as to Pennisi's declarations was not offered for this purpose. The State's evidence is to the effect he did not go to Wilmington, Delaware, but was murdered in Greensboro, N. C. Whatever its merits, the proposed additional exception to the hearsay rule should not be approved until a factual situation to which its application would be pertinent is before us.

Attention is directed now to North Carolina decisions which involve factual situations similar in certain respects to those

involved in the decisions discussed above. In each, the admissibility of the declarations was considered in terms of the *res gestae* exception to the hearsay rule. Even so, *the authority* of these decisions consists in the holding that the evidence was incompetent in the factual situation presented.

In *State v. Dula,* 61 N.C. 211 (1867), the defendant, having been convicted and sentenced for first degree murder, was awarded a new trial because the court admitted, over the defendant's objection, the testimony of one Betsey Scott that she saw Laura Foster, the deceased, on the morning of the day she was missing; that "she was riding her father's mare, bareback, with a bundle of clothes in her lap"; and that Laura said (1) that she was on her way to the Bates place, and (2) that Dula (defendant) had returned just before day, and (3) that she "expected to meet him at the Bates place." Chief Justice Pearson, for this Court, said: "The conversation between Mrs. Scott and the deceased ought not to have been admitted as evidence. At all events, no part of it except that the deceased said she was going to the Bates place. How what the deceased said in regard to the prisoner's having come just before day, and where he was, and that she expected to meet him, can in any sense be considered a part of the acts of deceased—being on her father's mare, bareback, with a bundle of clothes in her lap, and coming from her father's past A. Scott's house, when the witness met her in the road—we are unable to perceive. The law requires all testimony, which is given to the jury, to be subjected to *two tests of its truth:* 1. It must have the sanction of an oath. 2. There must be an opportunity of cross-examination. *Dying declarations* form an exception, and another exception is allowed when declarations constitute a part of the act, or *res gestae.*" Accord: *Mullins v. Commonwealth,* 113 Va. 787, 75 S.E. 193 (1912).

This Court found no error in the trial and conviction of Dula at his second trial. *State v. Dula,* 61 N.C. 437 (1868). It was there held that testimony as to the statement of Laura Foster, while riding in the direction of the Bates place, that *she* was going to that place, was properly admitted. Her declaration as to where she was going when headed in that direction was considered a part of the *res gestae.* At the second trial, no attempt was made to offer in evidence any declaration of Laura as to Dula's plans and conduct.

State v. Vestal

In *Gassaway v. Gassaway & Owen, Inc.*, 220 N.C. 694, 18 S.E. 2d 120, the question was whether the dependents of Harry C. Gassaway (Gassaway) were entitled to compensation on account of his death on Saturday, June 29, 1940, about 1:00 p.m., as the result of an automobile wreck on the road from Winston-Salem to High Point. Gassaway was the president and one of the principal stockholders of defendant. Defendant appealed from a judgment affirming an award made to the claimants by the North Carolina Industrial Commission. This Court reversed on two grounds, *viz.:* (1) Statements made by Gassaway the preceding Thursday and Friday night to the effect he was trying to get a certain highway job in High Point and planned to go there on Saturday for that purpose were held incompetent because "no part of the *res gestae";* and (2) these statements tended to show Gassaway's intended Saturday trip was not to perform any service of an ordinary employee or workman but to negotiate a contract as an executive officer of defendant.

In *Little v. Brake Co.*, 255 N.C. 451, 121 S.E. 2d 889 (1961), the question was whether the dependents of Arthur Herman Little were entitled to compensation on account of his death as a result of an automobile accident that occurred on January 8, 1957, about 8:25 p.m., at or near the intersection of N. C. Highway 41 and a rural paved road, about four miles south of the city limits of Lumberton. The Industrial Commission denied compensation, the superior court affirmed and the claimants appealed. This Court affirmed on the ground the claimants failed to offer competent evidence sufficient to support a finding that the death was by accident arising out of and in the course of the deceased's employment by defendant.

The claimants assigned as error the exclusion by the court of declarations attributed to the deceased, offered to show the purpose of the deceased's trip and that he was engaged in work for his employer at the time of his death. The substance of these statements and of the rulings of this Court is set forth in the following excerpt from the opinion of Justice (later Chief Justice) Parker, to wit:

"The deceased employee left the motel in Laurinburg on his fatal trip about 7:30 p.m. o'clock. His statement to H. F. Hoffman about 10:45 a.m. o'clock, 'I've got to be going along, I've got to be down at Whiteville to see a customer sometime

today,' was not connected with his act of departure at 7:30 p.m. o'clock, constitutes no part of the *res gestae,* and was inadmissible.

"The deceased employee after buying gas and talking with Z. R. Jackson at a service station went back to the motel, from there talked to his wife in Charlotte by telephone, went to the motel's office, and there T. T. McNair, manager of the motel, pointed out to him on a North Carolina highway map a route from Laurinburg to Lumberton, to Elizabethtown to White Lake to Burgaw, a distance of about 115 miles. His parents-in-law lived six miles north of Burgaw. He then ate supper in the motel dining room, and left on his fatal trip at 7:30 p.m. o'clock. In his statement to Jackson he said he was going to Lumberton and had a little business to attend to there, but he did not say it was his employer's business, or where he was going to in Lumberton. In our opinion, his statement to Jackson was not connected with his act of departure at 7:30 p.m. o'clock, and constitutes no part of the *res gestae,* and we are fortified in our opinion by the fact that he was killed by accident about four miles south of the city limits of Lumberton. In addition, claimants offered this evidence for the purpose of showing the purpose of his trip, and that he was engaged in work for his employer at the time of his death, but his statement to Jackson does not say what his business was in Lumberton, and has no relevancy to the fact sought to be proved. It was properly excluded.

"We now come to his statement by telephone to his wife around 7:00 o'clock p.m., 'that he was going to call on some more customers, so that he wouldn't have to spend another night, etc.' He did not state who these customers were, or where they lived. After his conversation he went to the motel's office, and its manager pointed out to him on a North Carolina highway map a route from Laurinburg to Burgaw, near which place his parents-in-law lived. He then ate supper, and left. He was killed outside his regular selling territory by accident about an hour and a half later."

The following excerpt from the opinion discloses that this Court was well aware of the divergent views as to whether the competency of such declarations should be tested by application of the *res gestae* exception to the hearsay rule or on the basis of a different specific exception to the hearsay rule. The

State v. Vestal

opinion states: "The rule that statements made by a person since deceased, as to the purpose or destination of a trip or journey he is about to make, may be proved as part of the *res gestae* when connected with the act of departure, has been recognized and given effect in the admission of such testimony in a considerable number of cases, and the evidence has been excluded in a number of other cases because not part of the *res gestae,* though recognizing the rule. *Gassaway v. Gassaway & Owen, Inc.,* 220 N.C. 694, 18 S.E. 2d 120; Anno. 113 A.L.R. 268-310, an elaborate annotation where a very large number of cases are cited and analyzed; Anno. 163 A.L.R. 21-25; Jones on Evidence, 2nd Ed., Vol. III, § 1220. Other theories for the admission of such statements have been propounded, but the 'theory of *res gestae* is by far the most popular theory of admission, though possibly not as well reasoned as the theory that the declarations are admissible as original evidence, as an exception to the hearsay rule.' Anno. 113 A.L.R. 275. An extraordinary development in the literature of *res gestae* was Dean Wigmore's Wholesale denunciation of the term itself. Evidence, 2nd Ed., § 1767. However, it is said in annotation 163 A.L.R. 20, 'The bench and bar in general have not agreed with Dean Wigmore.' "

In *Little v. Brake Co., supra,* there was no independent evidence that the deceased had visited any customer on the night of his fatal accident or that the accident occurred when he was en route to a customer's place of business.

The general rule the majority opinion seeks to approve recognizes that the death of a declarant, standing alone, is not sufficient ground for the admission of his declarations. Justification therefor is said to be found in what is called *a reasonable probability of truthfulness.* If admissibility is to be determined on this broad ground, the rule against hearsay evidence would be greatly impaired and presumably probability of truthfulness in a particular case would be determined by the presiding judge after a *voir dire* hearing. Whether a particular person is more inclined to tell the truth to his wife, his friend, or a stranger, when he is about to depart on a journey rather than on occasions unrelated to such departure, is subject to question. Certainly, the reasonable probability of the truthfulness of such declarations cannot be compared to the reasonable probability of the truthfulness of a dying declaration.

A dying declaration is admissible only if made when the declarant is in actual danger of death, in full apprehension of his danger and death ensues. *State v. Brown,* 263 N.C. 327, 332, 139 S.E. 2d 609, 612 (1965). When admitted, the credibility of the declarant and the weight to be given his dying declaration is for determination by the jury. It is subject to impeachment or corroboration in the same manner as the testimony of a witness who testified in person at trial. *State v. Debnam,* 222 N.C. 266, 22 S.E. 2d 562 (1942), and cases cited; Stansbury, North Carolina Evidence § 146, at 363 (2d ed. 1963); Note, 14 N.C.L.Rev. 380, 382-383 (1936); 40 Am. Jur. 2d Homicide § 390 (1968); 40 C.J.S. Homicide § 305 (1944); 1 Wharton's Criminal Evidence § 328 (12th ed. Anderson 1955); 5 Wigmore, Evidence § 1446 (3d ed. 1940); 2 Underhill's Criminal Evidence § 299 (5th ed. Herrick 1956).

If declarations of a deceased person are offered as evidence of the truthfulness of the statements contained therein, and such statements are admitted because of what is considered *the reasonable probability of their truthfulness,* it would seem that such declarations would be subject to impeachment or corroboration in the same manner as the testimony of a witness who testifies in person at trial.

As stated in the outset, I think *the fact* that Pennisi told his wife he was going to Wilmington, Delaware, on a business trip with no luggage other than a shaving kit, would be competent to explain (1) why *she* was not disturbed by Pennisi's absence until after he failed to come home when expected, that is, on the night of Monday, June 16th, and (2) why *she* waited until Wednesday, June 18th, before she reported Pennisi's absence to the Greensboro Police Department, *and for no other purpose.* Whatever its merits, it is both unnecessary and unwise to approve in general terms an additional exception to the hearsay rule when the case before us does not call for its application or consideration and when approval thereof tends to impair the authority of prior decisions of this Court.

Justices HIGGINS and SHARP join in this concurring opinion.