STATE OF NORTH CAROLINA v. LESTER SAWYER

No. 76

(Filed 9 May 1973)

1. **Assault and Battery § 14; Burglary and Unlawful Breakings § 5— felonious breaking and entering of home — felonious assault — sufficiency of evidence**

    Evidence in a felonious breaking and entering and felonious assault case was sufficient to withstand motion for nonsuit where it tended to show that defendant gained entry to a home while none of the occupants were there by ripping a lock off the door and that defendant struck an employee of the homeowner several times with a bicycle pump when the employee arrived at the home to investigate defendant's presence there.

2. **Criminal Law § 163— jury charge — sufficiency of assignment of error**

    Defendant did not comply with Rule 19(3), Rules of Practice in the Supreme Court, where he failed to indicate in what particular portions of the judge's charge to the jury were erroneous.

3. **Criminal Law § 95— corroborative evidence — admissibility**

    Testimony of three witnesses as to statements made to them by the victim of an assault tended to corroborate the testimony of the victim himself and was properly admitted for that purpose.

4. **Burglary and Unlawful Breakings § 7— verdict of guilty of felonious breaking and entering — necessity for guilty verdict on felonious larceny count**

  A verdict of not guilty in the larceny count against defendant did not require that judgment be arrested in the felonious breaking and entering count as a defendant need not successfully complete a larceny to be guilty of felonious breaking and entering.

5. **Assault and Battery § 17— verdict of guilty of assault with a deadly weapon — modification of sentence**

  The verdict returned by the jury which did not incorporate all of the elements of felonious assault must be treated as a verdict of guilty of assault with a deadly weapon with maximum punishment being imprisonment for two years.

APPEAL by defendant from *Thornburg, J.,* 30 October 1972 Criminal Session of BUNCOMBE Superior Court, transferred for initial appellate review by the Supreme Court by order dated 26 March 1973 entered pursuant to G.S. 7A-31 (b) (4).

At 17 October 1972 Criminal Session the grand jury returned two bills of indictment which charged defendant with criminal offenses alleged to have been committed on 18 July 1972.

In the first count of a two-count bill defendant was charged with feloniously breaking and entering the described dwelling house of one J. B. Roberts; and, in the second count, defendant was charged with the felonious larceny of described firearms of J. B. Roberts.

In a separate bill containing a single count defendant was charged with feloniously assaulting one Chester Ward.

Evidence was offered by the State and by defendant.

Uncontradicted evidence tends to show the facts narrated below.

J. B. Roberts (Roberts) owned a farm on Hamburg Mountain Road—off Reems Creek Road—in or near Weaverville. He had lived there since 1943. Chester Ward (Ward), who ran Roberts's farm, lived in a house some 500-600 feet above the Roberts residence.

A single lane gravel driveway led from Hamburg Mountain Road to the Roberts residence. There were some pines along this driveway. When leaving the Hamburg Mountain Road, you "go around a curve, and go up to the house."

Jerry Russell (Russell), a school principal, lived "just off" Hamburg Mountain Road. His house (mobile home) was approximately 500 yards northeast of the Roberts house. Both houses were up on hills. The Roberts house and all or most of the Roberts driveway could be seen from the Russell house.

Roberts had enclosed what had been a two-car garage and made it into a den or rumpus room. A carport immediately adjoined this room. The articles in the rumpus room included a gun rack, a bear hide and a pool table. Roberts had a collection of sixteen firearms, consisting of pistols, rifles and shotguns. Three were on the rack in the rumpus room. The others were on a rack in the hall near a bedroom.

Both Roberts and Ward had known defendant for ten years or more. About three years before 18 July 1972, defendant had painted the kitchen, bathroom and outside trim of the Roberts house. Mrs. Roberts had been at home when that painting was done. With this exception, Roberts had never given defendant permission to enter his home.

On Tuesday, 18 July 1972, Roberts left home about 9:15 a.m. His wife and children "had already gone that morning." During the past two years, Roberts's wife had been working with him at Roberts's place of business "on Tunnell Road next to the Highway Patrol." Roberts's guns were in the racks when he left that morning. Before leaving, Roberts locked the door to his house and talked with Ward about Ward's work for that day. Ward had been with Roberts for fifteen years and had a key to his house.

Nobody was at home at his house after Roberts left. Ward worked on the farm all day. He was using "a bush-hog behind a tractor" in the pasture above Ward's house. He was "on the other side of the tobacco barn" and "couldn't see the [Roberts] house all day" until late afternoon when he went there with Russell.

Russell returned from school about 7:15 p.m. He went directly to the Roberts house and parked his truck in Roberts's driveway. No one else was there. The door "leading into the house off of the carport" was closed. Russell was looking for Ward. He heard a tractor "running" and walked to a point 200-300 yards above the Roberts house where he found Ward operating "the tractor and bush-hog unit."

State v. Sawyer

Ward left the field with Russell. They went to Roberts's yard, got "in the Jeep," and drove to Russell's house to enable Russell to change his clothes. Roberts had a calf for Russell and Ward was going to help Russell move it from Roberts's barn to Russell's house. They got out of the Jeep at Russell's house. Before Russell could change his clothes, Ward and Russell saw an Oldsmobile car go up the Roberts driveway. Ward said, "I better go see who that is," got in his Jeep and went straight to the Roberts house. While waiting for Ward's return, Russell had fed his dog and had started toward the barn to feed his cow when he heard Ward coming back in the Jeep hollering, "Help, emergency," and saw that Ward "was bloody as a hog."

With reference to what occurred when he returned to the Roberts house, Ward's testimony, summarized except when quoted, is set forth below.

Defendant's Oldsmobile was parked, "headed right in towards [Roberts's] carport." After parking the Jeep, Ward went into the carport. When walking past defendant's car he noticed "painting outfit stuff" and old throw cloths on the back seat. The lock on the door from the carport to the rumpus room had been torn off. There were two holes in the door, right above the location of the lock. The lock itself had been prized off and was lying on the floor of the carport. Upon entering, Ward found defendant standing in the rumpus room. Three guns on the rack in the rumpus were gone. When Ward exclaimed, "His guns is gone," defendant said, "Don't you accuse me of that." Ward then asked, "What in the dickens are you doing here then?" Ward then went into the hall and defendant walked along with him. All the guns were gone from Roberts's main gun rack. When Ward said that he had to get a telephone and call Roberts, defendant knocked him down, "grabbed [him] by the throat . . . just like he was a'choking a chicken," and beat Ward over the head with a bicycle pump which had been lying on the pool table in the rumpus room. In addition to bruises, Ward's injuries included a split or "busted" ear and a "knot" on his forehead "as big as a goose egg." After beating Ward, defendant put the bicycle pump back on the table and went outside. Then he started calling to Ward to give him the keys to the Jeep. He did not get them. Soon thereafter defendant jumped in his car and drove away. When defendant left, Ward got into his Jeep and went back to Russell's house. Ward did not see defendant again until two or three days later.

Ward made no effort to look inside of defendant's car after he had been beaten. He "wasn't in much shape to do anything." Defendant did not offer to give Ward defendant's car keys or suggest that Ward search defendant's car. Instead, defendant gave him "no chance to look in."

Testimony of Russell, summarized except when quoted, includes the following: Ward's ear was cut and bleeding when he returned from the Roberts house. Referring to a knot on the front of Ward's head, Russell testified: "I have never seen a knot that big on a man before." There was "another pretty bad place . . . that was bleeding in the back of his head," and "a cut place . . . about an inch long around his neck. . . . " Russell and Ward went back to the Roberts house. Russell telephoned Roberts's place of business and was advised that Roberts was on his way home. There were no guns on the racks. A bent bicycle pump was on the pool table. There was a spot of blood on the floor. No chrome-looking or other pistol was under the pool table. Russell and Ward were leaving when Roberts arrived. There was other testimony by Russell as to statements made to him by Ward as to what had occurred in the Roberts house.

Testimony of Roberts, summarized except when quoted, includes the following: While on his way home, he passed defendant at the Reems Creek bridge. Defendant was driving an Oldsmobile. As they passed, Roberts "threw [his] hand up at him; [defendant] throwed his back." After meeting Ward and Russell, Roberts went back to the house and called the sheriff's department. With reference to Ward's condition, Roberts testified: "He . . . was bleeding all over. He had a big knot on his head. His ear was cut in two . . . and blood was running down his shirt." There was blood on the floor in the rumpus room. The bicycle pump was bent. The gun racks were empty. The value of the missing guns was $1,260.00. The knobs had been "knocked plumb off" of the door from the carport into the rumpus room. There were two holes the size of "a big screwdriver spike" above the place where the lock "had been yanked off." He had given no one permission to go into his home or to borrow or to use any of his guns. He did not recover any of his guns. Ward did not own or possess a gun. Roberts had never seen him with a gun. Roberts also testified to statements made to him by Ward as to what had occurred inside the Roberts house.

Maurice C. Ramsey, of the Buncombe County Sheriff's Department, answered Roberts's call. He arrived at the Roberts home about 7:45 p.m. He described the physical appearance of Ward, the condition of the door, the empty gun racks, and the bicycle pump. He also testified to statements made to him on that occasion by Ward.

Other evidence offered by the State included the following: Roberts and Ward testified that they had not seen defendant at the Roberts house since he worked on the painting job there three years or so prior to 18 July 1972. Roberts testified defendant had not done any work for him other than the painting job; that he had no recollection of any incident involving help by defendant "in baling some six or seven hundred bales of hay there on [his] property, in exchange for [Roberts] helping him and his daddy up there at Beech"; and that he recalled that Ward had "baled some hay for [defendant's] daddy." Ward testified that defendant "never did help us bale no hay" but that he [Ward] had "baled hay at [defendant's] daddy's house." Ward testified that he was fifty-eight years old; that he was something like "five foot seven and a half" tall; and that he guessed he did not "weigh over a hundred and twenty-five pounds soaking wet." Ward testified there was no pistol in the rumpus room when defendant attacked him; that he had not owned a pistol since he had been on the Roberts place; that he did not carry a pistol; and that he did not have a pistol in his possession on 18 July 1972.

Defendant's evidence consists solely of his own testimony which, summarized except when quoted, is set out below.

He had known both Roberts and Ward for ten or twelve years. On 18 July 1972 he drove to Roberts's house in his '63 blue and white Oldsmobile. He went there to see if he could arrange for Roberts to bale some hay for his [defendant's] father. Roberts had baled hay for the defendant's father in the past. On one occasion defendant had helped Roberts "put up about seven hundred bales in order to get [Roberts] to bale some for [defendant]." He drove up to the carport and parked. The windows were rolled down. He saw no one in or about the house. He had his painting equipment in his car. According to habit, he took his car keys with him when he got out of the car. He first went to the side door on the upper side of the house and knocked. This was not the door to the rumpus room. After he had knocked three or four times, he heard "a police radio"

State v. Sawyer

which would "come on and then go off." After this happened "three or four times," he figured there was somebody there and went to the bedroom window at the far end (from the rumpus room) of the house and knocked. He then walked around the house and hollered four or five times for Ward. He did not see Ward or anyone else.

As he started to leave the lower side of the house, he heard the Jeep pull up and saw Ward get out and go into the house. Just as defendant got to the corner of the house, Ward came out and said, "Lester, somebody stole all of J. B.'s guns." Defendant then went with Ward through the door from the carport to the rumpus room. It looked like somebody had prized the lock off of this door. Ward said that he would have to try to get in touch with Roberts. Defendant volunteered to help him. Defendant followed Ward to the telephone at the end of the hall. When Ward could not find the phone number, defendant suggested that he call information and get it. Then Ward accused defendant twice "of stealing J. B.'s guns." Whereupon, defendant reached in his pocket and got his car keys and offered them to Ward and told him to go search his car. As defendant turned around and started out the door, Ward said: "Wait a minute, I think I'll just blow your head off." When defendant turned around Ward had "a pistol right between [defendant's] eyes." It looked like "a chrome-plated .22 or .32 pistol." Ward and defendant were standing on opposite sides of the pool table. Defendant thought of running but decided against it. Instead, he again offered Ward his car keys and invited him to search his car. Whereupon, Ward said: "I ain't going to do that, I'm going to kill you." Defendant then "reached and grabbed that piece of pipe right there and knocked the gun out of his hand and kicked it up under the pool table . . . [and] hit him three times." Defendant then got in his car and left. He did not remember seeing Roberts "down near the mill wheel as [he] was going down."

Defendant testified that he was arrested on 20 July 1972. He testified that he was forty-one years old and weighed 229 pounds.

With reference to the first count in the two-count bill, which charged felonious breaking and entering, the jury returned a verdict of guilty as charged; and, based on this verdict, the court pronounced judgment imposing a prison sentence of ten years.

State v. Sawyer

With reference to the second count in the two-count bill, which charged felonious larceny, the jury returned a verdict of not guilty.

With reference to the separate bill which contained the single count charging felonious assault, the record shows the following occurred when the verdict was returned:

"THE COURT: Now you will have to listen to this and let me finish the question before you answer. As to the bill of indictment charging the defendant with the felonious crime of assault with a deadly weapon with intent to kill inflicting serious injury, do you find the defendant guilty as charged, guilty of assault with a deadly weapon inflicting serious injury, guilty of assault with a deadly weapon, guilty of assault inflicting serious injury, guilty of assault involving an attempt to inflict serious injury, guilty of simple assault, or not guilty.

"FOREMAN: Guilty of assault with a deadly weapon with the intent to inflict serious bodily harm.

"THE COURT: Members of the Jury, as your verdict you find the defendant guilty of assault with a deadly weapon inflicting serious injury. This is your verdict so say you all. (Affirmative response from Jury.)

"THE COURT: All right. You may have a seat."

Based upon this verdict, the court pronounced judgment which imposed a prison sentence of five years but provided that this sentence was to run concurrently with the ten-year sentence imposed by the judgment based on defendant's conviction of feloniously breaking and entering.

Defendant excepted and appealed.

*Attorney General Robert Morgan, Assistant Attorney General Roy A. Giles, Jr., and Associate Attorney John M. Silverstein for the State.*

*S. Thomas Walton for defendant appellant.*

BOBBITT, Chief Justice.

[1] Assignments of Error Nos. 10 and 11 relate to the denial of defendant's motions for judgments as in case of nonsuit. The rules applicable when testing the sufficiency of the evi-

dence to withstand a motion for judgment as in case of nonsuit have been often stated and need not be repeated. See *State v. Vestal,* 278 N.C. 561, 567, 180 S.E. 2d 755, 759-60 (1971), and cases cited. When considered in the light most favorable to the State, the direct and circumstantial evidence was sufficient to require that it be submitted to the jury in respect of the felonious breaking and entering and the felonious assault charges and to support the verdicts of the jury.

[2] In Assignments of Error Nos. 14, 15, 16, 17 and 18, defendant quotes excerpts from the charge and asserts the court erred in so charging the jury. In these assignments, defendant does not indicate in what particular any of the quoted excerpts is erroneous. He ignores the requirement of Rule 19 (3), Rules of Practice in the Supreme Court, 254 N.C. 783, 797, as interpreted in numerous decisions of this Court, that "always the very error relied upon shall be definitely and clearly presented, and the Court not compelled to go beyond the assignment itself to learn what the question is." *State v. Mills,* 244 N.C. 487, 94 S.E. 2d 324 (1956). Moreover, we perceive no error prejudicial to defendant in any of these excerpts.

[3] Assignments of Error Nos. 4, 5, 6, 8 and 9 refer to the admission over defendant's general objection of testimony of Roberts, Russell and Ramsey as to statements made to them by Ward shortly after Ward was injured. "The general admission of evidence competent for a restricted purpose will not be held reversible error in the absence of a request at the time that its admission be restricted." 7 Strong N. C. Index 2d, Trial § 17. See also Rule 21, Rules of Practice in the Supreme Court, 254 N.C. 783, 803. Obviously, the testimony to which these assignments refer was offered as tending to corroborate the testimony of Ward. Undoubtedly, if defendant had so requested, the trial judge would have given an explicit instruction to the effect that this evidence was competent for consideration only as corroborative testimony.

[4] Assignment of Error No. 20 is based on defendant's exception to the denial of his motions after verdict for the arrest of judgment in each of the two cases in which verdicts of guilty were returned. Defendant did not then state any ground on which he based these motions. On appeal, he refers only to his motion to arrest judgment in the case in which defendant was found guilty of felonious breaking and entering. He asserts that the verdict of not guilty in the larceny count requires that judg-

ment be arrested in the felonious breaking and entering count. This contention is without merit. Pertinent legal principles include the following: "Under G.S. 14-54, if a person breaks or enters one of the buildings described therein with intent to commit the crime of larceny, he does so with intent to commit a felony, without reference to whether he is completely frustrated before he accomplishes his felonious intent. . . . [H]is criminal conduct is not determinable on the basis of the success of his felonious venture." *State v. Smith,* 266 N.C. 747, 147 S.E. 2d 165 (1966); *State v. Nichols,* 268 N.C. 152, 150 S.E. 2d 21 (1966).

Defendant's brief states no reason or argument and cites no authority in support of Assignments of Error Nos. 1, 2, 3, 7, 12, 13 and 19. Hence, they are deemed abandoned. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810.

[5] Assignment of Error No. 18 is based on defendant's exception to the court's failure to pronounce judgment on the verdict as stated in the words of the foreman. The record pertinent to this assignment quoted in our preliminary statement indicates that the presiding judge failed to hear or fully comprehend what the foreman had said. Under the circumstances, we think the judgment in the felonious assault case must be based on the verdict as stated in the words of the foreman.

The verdict as returned by the jury did not incorporate all of the elements of felonious assault. It must be treated as a verdict of guilty of assault with a deadly weapon. Hence, the maximum punishment was imprisonment for a term of two years.

Although the sentence pronounced in the two judgments are to run concurrently, the judgment in the felonious assault case is modified to provide for a sentence of two years in lieu of a sentence of five years; and, upon certification of this opinion to the superior court, a new commitment will be issued to reflect this modification of the judgment. As heretofore the sentences pronounced in the judgment for felonious breaking and entering and in the modified judgment for assault with a deadly weapon are to run concurrently.

The conclusion reached is as follows: There was no error in the trial or judgment in the felonious breaking and entering case. There was no error in the trial and verdict of guilty of

assault with a deadly weapon in the felonious assault case; however, the judgment in the assault case is modified so as to reduce the sentence from five years to two years and, as so modified, is affirmed.

Felonious breaking and entering case: No error.

Assault case: No error in trial; judgment modified and affirmed.