STATE OF NORTH CAROLINA v. WILLIAM J. "BILL" DOOLEY

No. 7327SC695

(Filed 12 December 1973)

1. Searches and Seizures § 2— voluntariness of consent to search — necessity for voir dire

Though the trial court did not conduct a *voir dire* and make specific findings as to whether defendant's consent to search his premises was voluntarily and understandingly given, evidence in the record was sufficient to sustain a finding of voluntariness where it tended to show that officers approached defendant as he sat on the porch of his home, defendant was given the *Miranda* warnings after which he told officers that the gun used in the murder was in the house and they could get it, and defendant accompanied the officers into his house while the gun was retrieved from its hiding place.

2. Criminal Law § 75— Miranda warnings given — voluntariness of statements

Where defendant was given the *Miranda* warnings at least two times following his arrest and before he made inculpatory statements, such statements were freely, understandingly and voluntarily made and were not the product of interrogation, prodding or any coercion.

3. Criminal Law § 77— self-serving declarations — exclusions proper

Where statements made by the defendant to a police officer were not part of the *res gestae*, the trial court properly excluded the statements as self-serving declarations.

APPEAL by defendant from *McLean, Judge,* 9 April 1973 Session of Superior Court held in GASTON County.

This is a criminal action in which the defendant, William J. "Bill" Dooley, was charged in a bill of indictment, proper in form, with the first degree murder of Troy L. (Towhead) Thomas. At the call of the case the State elected to proceed only on second degree murder or manslaughter as the evidence might show. The defendant entered a plea of not guilty.

On 18 January 1973 as a result of a telephone call to assist another unit with reference to a shooting, Officer Sprott went to defendant's home at 1013 Airline where he found the deceased lying across the railroad track approximately twenty feet from a fence which was located at the top of a bank south of defendant's back door. Thomas appeared to be alive but unconscious when Officer Sprott arrived at the scene. From the railroad track, Officer Sprott could see the defendant standing inside the back door entrance of his home.

Officers Bell and Grant arrived at defendant's residence shortly after Officer Sprott and found defendant sitting on the front porch of his house. The officers could tell that defendant had been drinking some alcoholic beverage; and because the defendant insisted on talking, they advised him of his constitutional rights. Defendant revealed the location of the pistol; and Officer Bell, testifying on voir dire, described the events which resulted in the discovery of the gun as follows:

"We asked him would he get the gun for us, and he said, 'It's in the house, go get it.' And we didn't go until we give him time to get up, and he took us in the house—myself, and Officer Sprott, and Officer Homer Grant. Mr. Dooley went in the house and sat on the couch, and he told Mr. Grant where the gun was at, located in a bedroom, and I followed Mr. Grant into the bedroom, and he found the gun between the pillow and the mattress. That was after I advised him of his rights."

The gun (State's Exhibit No. 3) was determined to be a .22 caliber pistol and had three spent shells in it when found.

The defendant was taken to the police station where he was again advised of his rights and at that time the defendant kept saying to the detectives, "I killed the son-of-a-bitch [and] Towhead Thomas was no good."

The defendant testified and offered evidence tending to show that on 18 January 1973, he was in his backyard with his wife's .22 caliber pistol to shoot rats which had been killing his puppies. While the defendant was in the backyard, Robert Cunningham and Towhead Thomas came by and the three engaged in conversation at the fence. Thomas asked the defendant for a drink, and Cunningham was dispatched to purchased a bottle of wine. While Cunningham was gone, the defendant and the deceased discussed the fact that Dooley would not have anything to do with Towhead. When Cunningham returned, Thomas drank all but a small portion of the wine which defendant drank. Dooley testified:

"Well, then he [Thomas] said, 'Well, we'll just shake hands and be friends,' and I said, 'Good,' and I said, 'We'll be on good speaking terms.' We shook hands over the fence and he started off. I don't know how far he got. The first thing I knowed, I seen him coming back running up the bank, and

State v. Dooley

he said, 'I'll just kill you, you son-of-a-bitch, or you'll kill me, one.' And I shot in the ground. Yes, sir, I saw a knife on him at that time. It was in his right hand. I shot in the ground, and he kept coming, and I fired twice in the air. At the time he was coming up the hill with the knife, and after he threatened me, I asked him to stop, yes, sir. That is when I fired in the ground, yes, sir. I attempted to move backwards. I got about three foot from the fence before I fell, almost to the top of the bank. Well, I lost one of my crutches, and fell down and had to get up and get the other crutch together. Didn't go plumb down, went almost down and lost my crutch. [Dooley had only one leg.] He was three foot of the fence.

He was coming straight on just as hard as he could come. I fired once in the ground and then I fired twice in the air, and he was still coming right towards me. Then he turned around and went back toward the railroad track down the bank incline there. I then went in the house. I put the gun under the pillow in the bedroom. Yes, sir, I had something to drink in the house. I had about a pint or half-pint of liquor. I drank that. I went out on the front porch and set down until the police came. And Detective Bell, Sergeant Posey and the other officers, and Captain Elmore came up and a deputy sheriff, too.

I told them where the gun was at, yes, sir. I told them it was under a pillow in the bedroom."

The jury found the defendant guilty of manslaughter and from a judgment imposing a prison sentence of not less than twelve nor more than fifteen years, he appealed.

*Attorney General Robert Morgan and Associate Attorney E. Thomas Maddox, Jr., for the State.*

*Harris and Bumgardner by Don H. Bumgardner for defendant appellant.*

HEDRICK, Judge.

[1] Defendant's Exceptions II, III, IV, V, and VI relate to the admission into evidence of the .22 caliber pistol found in defendant's home and the statements allegedly made by him at the Police Station. First, defendant contends the gun was the product of an illegal search and seizure. We do not agree.

In *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971), we find the following:

> "The owner of the premises may consent to a search thereof and thus waive the necessity of a valid search warrant so as to render the evidence obtained in the search competent. (citations omitted) To have such effect, the consent of the owner must be freely and intelligently given, without coercion, duress, or fraud, and the burden is upon the State to prove that it was so, the presumption being against the waiver of fundamental constitutional rights. *State v. Little,* 270 N.C. 234, 154 S.E. 2d 61. However, the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, in order to make competent a confession made in custody, need not be given by officers before obtaining the consent of the owner to a search of his premises. *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25."

While the court did not conduct a voir dire and make specific findings as to whether the defendant's consent to search his premises was voluntarily and understandingly given, we think such a finding is implicit in the ruling on defendant's objection to the admission of the gun in evidence. Immediately before the gun was offered into evidence, the court conducted a voir dire with respect to the admission of certain statements allegedly made by the defendant when he was arrested on his front porch. The record shows that the defendant was given the "Miranda" warnings and that he told the officers that the gun was in the house, "go get it." The defendant accompanied the officers into his house and sat in the living room while the gun was retrieved from its hiding place under the pillow in the bedroom. Therefore, in our opinion, there is plenary, uncontroverted evidence in the record to sustain a finding that the defendant understandingly and voluntarily gave the officers permission to retrieve the gun with which the crime was committed.

[2] With respect to the admission into evidence of the inculpatory statements made by the defendant at the police station, he contends:

> "The court erred in allowing the statement by the defendant into evidence on the grounds that the defendant was not properly warned of his rights and was not in a

physical condition to voluntarily and knowingly waive his rights against self-incrimination."

The record reveals that the defendant was arrested about 2:00 p.m. and taken to the police station where he made the statements challenged by these exceptions. Officer Bell testified:

"I had occasion to see the defendant at the City Hall. It would have been between 2:05 and 2:57, in that period of time—it was around—2:15 or 2:57, in that period of time— approximately an hour. No officer was questioning him at that time, he was just sitting in there in the City Hall at the chair in the Detective Bureau and nobody was asking him anything at that time."

"Mr. Dooley kept saying to the detectives, 'I killed the son-of-a-bitch.' Stated that 'Tow-head Thomas was no good.'

* * * The defendant was talking on his own, at that time."

In *State v. Painter*, 265 N.C. 277, 144 S.E. 2d 6 (1965), the court concluded, as summarized below, the following:

Where there is plenary evidence to sustain a finding that the confession was voluntary and no evidence to the contrary and defendant merely objects to the admission of the confession but offers no evidence in regard to its voluntariness, the ruling of the court admitting the confession amounts to a finding that the confession was voluntary, and the absence of a specific finding of voluntariness is not fatal.

The defendant was given the "Miranda" warnings when he was arrested at his home and was again given the "Miranda" warnings, the record shows, "between 2:05 and 2:57." While it would have been better had the trial court upon the defendant's objection conducted a *voir dire* and made findings and conclusions regarding the admissibility of the proffered testimony, *State v. Moore*, 275 N.C. 141, 166 S.E. 2d 53 (1969); *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1 (1966), we are of the opinion that there is plenary evidence in the record to sustain a finding that the defendant was given the "Miranda" warnings at least two times following his arrest and before he made the inculpatory statements which are the subject of these exceptions and that such statements were freely, understandingly, and volun-

tarily made and were not the product of interrogation, prodding, or any coercion. Furthermore, we do not perceive how the defendant could have been prejudiced by the admission into evidence of either the gun or his inculpatory statements since he testified in his own behalf that he shot the deceased with the .22 caliber pistol, put it under his pillow, and told the officers where to find it. These exceptions are not sustained.

With respect to the cross-examination of Officer Bell, the record discloses:

"I had occasion later on to talk with Mr. Dooley, later that day and the next day. At this time he made a statement to me. I have that statement with me. The statement was made at about 2:57 and I had arrived at the scene at 2:05. It was signed by myself—Prior to giving that statement, Mr. Dooley was advised of his rights. He was at the police office at the time it was given.

Q. Would you read the statement what he told?

OBJECTION: SUSTAINED.

MR. BUMGARDNER: Your Honor, may I be heard outside of the presence of the jury?

COURT: All right, members of the jury, step out to your room.

(JURY LEAVES COURTROOM)

Mr. Bumgardner argues to the court concerning the ruling on the objection, and asks the court to permit him to have the statement proffered into evidence . . . DENIED by the court.

EXCEPTION No. VII"

[3] Defendant argues that since the court admitted the inculpatory statements of defendant which were the subject of Exception No. VI, it was error not to allow Officer Bell on cross-examination to read into evidence the complete statement given to Officer Bell which he (the officer) had reduced to writing. We do not agree. It being clear that the statements made by the defendant to Officer Bell which the defendant sought to have the officer read into evidence on cross-examination were not a part of the res gestae, the court properly excluded the statements as self-serving declarations, *State v. Mitchell*, 15

N.C. App. 431, 190 S.E. 2d 430 (1972) ; *State v. Davis,* 13 N.C. App. 492, 186 S.E. 2d 180 (1972) ; *State v. Chapman,* 221 N.C. 157, 19 S.E. 2d 250 (1942).

Furthermore, since the oral statements admitted by the court were not the same or a part of the written statement excluded by the court, there is no merit in defendant's contention that the latter was admissible under the general rule that:

"When a party's declaration is offered against him as an admission, he is entitled to have everything brought out that was said at the time in connection with the point in controversy and explanatory of the admission, as well those parts which tend to discharge him as those which tend to charge him." Stansbury's North Carolina Evidence, Brandis Revision, Volume 2, Admissions, Sec. 181, at p. 60.

Additionally, defendant contends the court erred in denying his motion for judgment as of nonsuit, in admitting the spent shells found in the gun into evidence and in failing to instruct the jury as requested on the defendant's right to defend his habitation and curtilage from a trespasser. We have carefully examined these contentions and find them to be without merit.

The defendant had a fair trial free from prejudicial error.

No error.

Judges CAMPBELL and VAUGHN concur.